LOYOLA UNIVERSITY OF CHICAGO, Plaintiff-Appellant, v. THE HU-
MAN RIGHTS COMMISSION *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 85—3690

Opinion filed November 5, 1986.

Steven H. Hoeft and Stephen D. Erf, both of McDermott, Will & Emery, of Chicago (William Oswald and Leon S. Conlon, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Imelda R. Terrazino, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Loyola University of Chicago, appeals from a trial court order affirming a decision of the Human Rights Commission which held that plaintiff discriminated against defendant Eugene Irvin, Sr., on the basis of race and the basis of retaliation for his filing a complaint with the Commission. On appeal plaintiff contends that the Commission's decision is against the manifest weight of the evidence because it disregards certain evidence, because Irvin failed to establish a *prima facie* case of racial discrimination and retaliation, and because plaintiff's reason for discharging Irvin was not shown to be pretextual. Plaintiff also contends that the Commission abused its discretion by awarding reinstatement, back pay, and attorney fees.

Irvin, a black male, began working as a security officer at plaintiff's medical complex in Maywood on January 28, 1980. A June 1980 job evaluation rated Irvin's work performance "excellent—consistently exceeds most performance standards," and added that he would be promotable in the future. A January 1981 job evaluation again rated his performance as excellent and stated that Irvin was promotable now. His job strengths were listed as "job knowledge, dependability, adaptability, and ability to work with others."

On April 1, 1981, Irvin filed a charge of race discrimination with the Department of Human Rights alleging that he was denied a promotion because of his race. On April 8, 1981, plaintiff received notice of the charge. On April 27, 1981, Susan Paraday, another employee, wrote a letter to plaintiff alleging that Irvin had made sexually suggestive comments to her. On May 12, 1981, plaintiff's personnel director held a meeting at which Irvin was asked to respond to the allegations made by Paraday. Irvin denied the charges. On May 13, 1981, Irvin filed a charge with the Department of Human Rights alleging retaliation for having filed the original failure-to-promote charge. On May 15, 1981, plaintiff fired Irvin. On May 20, 1981, Irvin amended his retaliation charge to include the termination. On November 17, 1981, the Department of Human Rights filed a report finding plaintiff had treated Irvin differently than it had treated other employees, and

on March 31, 1982, the Department filed a complaint with the Human Rights Commission. On April 21 and 22, 1983, a hearing was held before an administrative law judge (ALJ). The following evidence was adduced.

The April 27 letter from Paraday to plaintiff stated that on April 26 at 6:30 a.m. Irvin came in to relieve Paraday, who commented that she was tired. Irvin remarked that she could rest on a table in the obstetric-gynecological department, referring to the stirrups at the ends of the table, because the "stirrups are good to hold the legs apart." Paraday left the control center in disgust. The letter also referred to other instances when Irvin made suggestive remarks to Paraday, "remarks that I feel have sexual meanings on his part." In March Irvin called Paraday and asked if she liked him. When she replied negatively, Irvin asked if she hated him. Paraday again replied negatively. Irvin then asked Paraday to give him a wake-up call. "Almost whenever Irvin sees me he starts a conversation and does it with almost the same kind of suggestive remarks." The letter concluded by stating that Paraday did not want to hurt Irvin, but that she wished the department director would make him stop his behavior towards her.

At the hearing, it was established that plaintiff has written disciplinary procedures which grade offenses on four levels. The procedures assign a specific disciplinary measure to each level of offense, depending on the severity of the offense and the number of previous offenses committed in the preceding year. Level 1 offenses require a verbal reprimand for a first offense; a first written warning for a second offense; a second written warning for a third offense; suspension of one to five days for a fourth offense; and discharge for a fifth offense. Level 2 offenses require a written warning for a first offense; suspension of three days for a second offense; and discharge for a third offense. Level 3 offenses require suspension of five days for a first offense, and discharge for a second offense. Level 4 offenses require discharge for the first offense.

Irvin's discharge report showed that he had received three verbal warnings in the eight months prior to his termination but that none were for the same type of offense. On August 8, 1980, he was verbally warned for not following proper departmental procedure in filing a complaint with the State's Attorney on behalf of plaintiff against another employee for theft. On January 16, 1981, Irvin was verbally warned for falling asleep during a departmental meeting. On April 12, 1981, 11 days after filing his original discrimination complaint, he was verbally warned for not carrying a flashlight. The re-

port further indicated that Irvin had been discharged for "conduct which violated community standards of decency and morality; sexual harassment," which is a level 3 infraction. The discharge report did not mention Irvin's conduct during the May 12 meeting. The report was prepared by Paraday's supervisor, who had not attended the meeting. Irvin's termination notice stated that Irvin "had a very disruptive influence upon operations of the security department and the department's employees."

Through the testimony of Leslie Gallay, plaintiff's employee-relations manager, and Edward Pedziwiatr, plaintiff's director of security, it was established that in the year preceding Irvin's termination plaintiff had disciplined other employees for the level 3 offense of immoral and indecent conduct. On May 31, 1980, Jaime Ochoa, a nonblack, received a five-day suspension after grabbing the breast of a deaf-mute employee in a store room. Ochoa admitted to the misconduct and promised to cease such harassment. Ochoa had received a written warning for a level 2 violation 2½ years prior to the sexual-harassment incident. In September 1980, Alex Surmaczynski, a nonblack, received a five-day suspension for a level 3 infraction after several female employees reported various acts of Surmaczynski. These incidents included following one woman into an elevator and asking if she loved him; following her on a different occasion and patting her on the buttocks; asking her on another day if she would go out with him; touching another woman's breast; and waiting at the bottom of stairs to watch women walk upstairs. Surmaczynski admitted his misconduct and apologized. Surmaczynski had received a written warning for a level 2 violation 18 months earlier. On March 10, 1981, Manuel Garcia, a nonblack, received only a verbal warning after several women reported that he had made lewd remarks and improper gestures, including rubbing the thigh of a nurse who was taking his blood pressure in the emergency room. Garcia admitted to the misconduct, was remorseful, and apologized. The three evaluations given Garcia prior to this incident rated his work as "very good" and all three evaluations listed areas needing improvement. Garcia had received a level 3, five-day suspension 2½ years earlier, and a written warning for a level 2 offense 2 years earlier.

It was further established that on May 5, 1980, Thomas Campagna, a security officer, was discharged for having a female employee sitting on his lap while he was on duty in the main lobby. Campagna failed to enforce visitor policy or monitor visitor passes during this time. While the original charge was classified as level 3—"immoral and indecent conduct which violates common decency or moral-

ity"—the charge was subsequently changed to level 4—"actions which could reasonably cause harm to patients, students, visitors, or employees through intentional acts of commission or omission." Campagna had received two written disciplinary warnings during the year prior to his termination. The first warning was for tardiness and the second was for action which could cause harm to a trainee officer.

Lowell Dunlap, assistant to plaintiff's vice-president for administration, testified that Irvin was fired because of the Paraday incidents, including a verbal attack on Paraday at the May 12, 1981, meeting. Dunlap stated that at that meeting, Irvin was confronted by Paraday in front of their supervisors. At one point, Irvin turned to Paraday and "said words to this effect, 'Your husband would be very interested in knowing about your boy friend.'" Dunlap stated that the people at the meeting viewed the remark as a "verbal attack" which was "irrelevant to the nature of the charges." Dunlap believed that discharging Irvin was the only way to guarantee that the harassment would not occur in the future. Dunlap testified further that during various conversations he had with Paraday concerning Irvin, she had been very distraught.

Pedziwiatr testified that Irvin was fired because of his performance in the department, his comment that Paraday was dating an engineer, and the sexual comment on April 26. At the May 12 meeting, Irvin "mentioned something about Susan Paraday dating an engineer in the maintenance department." Pedziwiatr believed Irvin was merely trying to discredit Paraday. Pedziwiatr thought that very few people in the department liked Irvin, that his superiors had difficulty with him, that he was a trouble maker, and that his presence was counterproductive to efficiency and morale.

Irvin testified that on April 26, 1981, he spoke with Paraday twice but did not make sexually suggestive remarks to her. When he arrived to relieve her, an engineer was about 30 feet away. Irvin stated further that at the May 12 meeting he was shown Paraday's letter and that was the first time he heard of the sexual-harassment charges. He denied the allegations and asked Paraday why she would do something like that. Irvin stated that he had no other direct conversation with Paraday during the meeting. At the end of the meeting, Irvin spoke to the personnel director, saying "Mr. Heuel, it isn't even logical that a man would say something out of the way to a female and her boy friend is right there about 25 or 30 feet away from them." Irvin testified that on May 15 he was told by his supervisor and the director that since Irvin would not resign and would not admit what he had done he was being fired. He was given no other rea-

sons for the discharge. Irvin also stated that on other occasions he had asked Paraday to give him a wake-up call, which was a typical practice for the security personnel.

Norbert Heuel, personnel director, testified that when Irvin was first confronted with Paraday's letter at the May 12 meeting, Irvin asked if an engineer had been present when the comment was allegedly made. Paraday stated that the engineer had not been present, and Irvin replied that he would not make those statements in front of the engineer. Heuel described Irvin as very annoyed and "not hostile, but I think he was retaliatory." Heuel testified that generally sexual-harassment charges were investigated and turned over to the EEO officer. He also stated that sexual harassment was a level 3 infraction which required suspension before discharge. During Heuel's testimony, plaintiff attempted to introduce a letter written by Irvin's estranged wife accusing him of misconduct generally related to his family life. The letter was received by plaintiff on August 9, 1982. Heuel testified that the allegations typically trigger an investigation and possibly termination. The ALJ refused to admit the letter as evidence on the grounds that it was hearsay and received after the termination.

Susan Paraday, a security-officer dispatcher, testified that Irvin had made the comment regarding her resting on an obstetric-gynecological table on April 26, 1981. Irvin had previously made comments to her, but none had been so direct and usually she just ignored him. The previous comments included such statements as "I can't believe a girl like you would be going straight home," or saying that a girl like Paraday should have lots of boyfriends. After Irvin made the comment on April 26, Paraday walked out of the room. Paraday was advised by a co-worker to report the incident to the director. Paraday also testified that at the May 12 meeting, Irvin "denied ever saying anything and just got very upset, saying that I had a lot of boyfriends *** implicating one of the engineers." Paraday could not remember exactly what Irvin said at the meeting. She believed that Irvin was "just hurt and had to get back at me." After the meeting, Paraday went to Hogan's office, crying, and told Hogan she was going to quit. She testified that she was not afraid of Irvin.

Sandra O'Rourke, a security officer, testified that she and Paraday were friends and had discussed Irvin's behavior several times. O'Rourke believed Irvin's misconduct was escalating and she advised Paraday to report the behavior to the director.

John Hogan, associate director of security, testified that Paraday came to his office on April 27, 1981, with the letter describing the in-

cident with Irvin. Paraday was crying and considering quitting. She said this was not the first time Irvin had made suggestive remarks.

Following the hearing, the ALJ issued an interim recommended order and decision. The ALJ found that plaintiff's stated reason for dismissing Irvin was sexual harassment committed on April 26, "as well as other alleged generally related incidents between the two, either mentioned in that letter or at the May 12, 1981 meeting." The ALJ found that the termination was inconsistent with plaintiff's past policies which make a 5-day suspension appropriate because Irvin's conduct "was a first offense under Respondent's disciplinary procedure." The ALJ continued that Irvin's termination was disparate from plaintiff's discipline of three nonblack employees accused of sexual harassment, as Irvin's acts were no more severe than the acts of the other three employees. The ALJ found that Campagna was not similarly situated because he was fired for failure to carry out his work duties and was not accused of sexual harassment. The ALJ also found that evidence of any comments made prior to April 26 was sketchy but that these comments did not appear to be sexual in meaning. In regard to the May 12 meeting, the ALJ found that each witness had a different version of Irvin's comments. "Even when taken in the light least favorable to Complainant, I find no sexual nature to this comment. Nor would it qualify as a sexual advance, or a request for a sexual favor."

The ALJ concluded that Irvin had made a *prima facie* case of racial and retaliatory discrimination against plaintiff; that plaintiff articulated a legitimate nondiscriminatory reason for its action; that Irvin demonstrated those reasons were pretextual; and that plaintiff has discriminated against Irvin on the basis of race and in retaliation for his previous charge of a civil rights violation. The ALJ recommended that the complaint be sustained; that Irvin be reinstated and given back pay; that plaintiff pay reasonable attorney fees and costs to Irvin. Irvin filed a petition for costs and attorney fees. Plaintiff filed general exceptions to the ALJ's findings and recommended order, and objections to Irvin's petition. The ALJ issued a recommended order and decision incorporating his interim report and awarding Irvin $17,722 for attorney fees.

On September 19, 1984, a hearing was held before the Commission. On March 4, 1985, the Commission adopted the ALJ's recommended order and decision. On November 19, 1985, the trial court upheld the Commission's order.

■ Under the Illinois Human Rights Act (Act), the Commission's findings of fact shall be sustained unless the court determines that

such findings are contrary to the manifest weight of the evidence. (Ill. Rev. Stat. 1985, ch. 68, par. 8—111(A)(2).) Moreover, judicial review under the Act is to be in accordance with the provisions of the Administrative Review Law (Ill. Rev. Stat. 1985, ch. 110, par. 3—101 *et seq.*) (Ill. Rev. Stat. 1985, ch. 68, par. 8—111(A)(1)). Under the Administrative Review Law, the agency's findings of fact shall be held to be *prima facie* true. (Ill. Rev. Stat. 1985, ch. 110, par. 3—110.) The decision of the administrative agency is not to be overturned unless contrary to the manifest weight of the evidence. *General Electric Co. v. Fair Employment Practices Com.* (1976), 38 Ill. App. 3d 967, 349 N.E.2d 553.

■ Plaintiff contends that the Commission's finding that Irvin established a *prima facie* case of discrimination is against the manifest weight of the evidence. In analyzing employment discrimination actions under the Illinois Human Rights Act, Illinois courts use the three-step analysis set forth in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817. (See *Village of Oak Lawn v. Human Rights Com.* (1985), 133 Ill. App. 3d 221, 478 N.E.2d 1115; *Freeman United Coal Mining Co. v. Fair Employment Practices Com.* (1983), 113 Ill. App. 3d 19, 446 N.E.2d 543.) Initially, the employee has the burden of proving by a preponderance of the evidence a *prima facie* case of unlawful discrimination. This creates a rebuttable presumption. (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.) The employer must then clearly set forth a legitimate, nondiscriminatory reason for its employment decision in order to successfully rebut the presumption of unlawful discrimination. (450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.) If the employer is successful, the presumption of unlawful discrimination is no longer present in the case. (450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.) The employee must then prove by a preponderance of the evidence that the legitimate reason offered by the employer was not the true reason underlying its employment decision and that it was only a pretext. This burden merges with the employee's ultimate burden of proving whether the employer unlawfully discriminated. 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089; *Village of Oak Lawn v. Human Rights Com.* (1985), 133 Ill. App. 3d 19, 446 N.E.2d 543.

■ Irvin has alleged discrimination based on both race and retaliation. A *prima facie* case of discrimination based on retaliation may be established by showing a short time span between the filing of the charge and the employer's adverse action. (*Alexander v. Fair Employment Practices Com.* (1980), 83 Ill. App. 3d 388, 403 N.E.2d

1271.) On April 1, 1980, Irvin filed a charge that plaintiff failed to promote him on the basis of his race. On April 8 plaintiff received notice of the charge. On April 29 a fact finding conference was held. On May 12 plaintiff held a meeting regarding the sexual-harassment allegations with Irvin and many of the same persons who were involved in the conference concerning the failure-to-promote charge. On May 15 Irvin was fired. Plaintiff argues that after Paraday's alleged harassment on April 27, Irvin was not discharged until May 15 and that the time between Irvin's filing a charge and Paraday's alleging harassment was a mere coincidence which cannot create an inference of retaliation. The focus, however, is on the relationship between the filing of the failure-to-promote charge and the discipline plaintiff imposed for the sexual-harassment offense, and not on the relationship between the filed charge and Paraday's allegations. The short period of 37 days between the filed charge and plaintiff's decision to fire Irvin is sufficient to establish a *prima facie* case of discrimination based upon retaliation.

■■ A *prima facie* case of discrimination based on race may be established by showing that similarly situated employees of a different race were treated more favorably, and what constitutes that *prima facie* case will vary according to the specific claim. (*McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817.) We are not concerned with the harshness of the discipline imposed in itself but instead are only concerned with whether the discipline was harsher than that imposed on comparable persons of other races. (*Mosley v. General Motors Corp.* (E. D. Mo. 1980), 497 F. Supp. 583, *aff'd* (8th Cir. 1982), 691 F.2d 504.) An employer cannot impose different standards of discipline on different races. (*McDonald v. Santa Fe Trail Transportation Co.* (1976), 427 U.S. 273, 49 L. Ed. 2d 493, 96 S. Ct. 2574.) In the year prior to Irvin's termination, three other employees were charged with sexual harassment, yet plaintiff either imposed no discipline or only briefly suspended those employees, while it fired Irvin for the same level 3 offense. Thus, Irvin established a *prima facie* case by proving that he is a member of a protected class who was disciplined in a harsher manner than comparably situated persons of a different race. (See *Mosley v. General Motors Corp.* (E. D. Mo. 1980), 497 F. Supp. 583.) We also agree with the Commission that plaintiff has successfully articulated a legitimate, reasonable explanation for its disciplinary action.

■■■ Plaintiff's successful rebuttal of the presumption of discrimination permits the presumption to drop from the case. At this point, Irvin may show that plaintiff's stated reasons for discharging him are

pretextual. One method of showing pretext is to demonstrate that employees involved in misconduct of comparable seriousness were retained, while the complainant was discharged. (*McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817; *Donaldson v. Taylor Products Division of Tecumseh Products Co.* (7th Cir. 1980), 620 F.2d 155.) An employer may justifiably discipline disruptive employees, but only if the disciplinary criterion is applied alike to all races. (*McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817.) An employer cannot retain guilty employees of one color, while firing guilty employees of another color. (*McDonald v. Santa Fe Trail Transportation Co.* (1976), 427 U.S. 273, 49 L. Ed. 2d 493, 96 S. Ct. 2574.) Disciplining employees in a different manner is probative of discrimination only if the other employees were situated similarly to complainant. (*Donaldson v. Taylor Products Division of Tecumseh Products Co.* (7th Cir. 1980), 620 F.2d 155; *Corley v. Jackson Police Department* (5th Cir. 1978), 566 F.2d 994.) To determine whether the employees were situated similarly, courts focus on the similarity of the misconduct and the employees' work records. (*Gill v. Westinghouse Electric Corp.* (N. D. Ill. 1984), 594 F. Supp. 48; *Williams v. Yazoo Valley-Minter City Oil Mill, Inc.* (N. D. Miss. 1978), 469 F. Supp. 37.) "Precise equivalence," however, is not required. (*McDonald v. Santa Fe Trail Transportation Co.* (1976), 427 U.S. 273, 49 L. Ed. 2d 493, 96 S. Ct. 2574. The other employees' circumstances need only be sufficiently parallel to permit an inference of comparability. 427 U.S. 273, 49 L. Ed. 2d 493, 96 S. Ct. 2574.

■ In the present case, we find Irvin has established that the three employees he uses as comparatives were similarly situated. Initially we note that the Commission apparently erred in stating that Irvin's discharge report "shows no warnings of any sort were given to Complainant in the twelve month period prior to the discharge." The report is somewhat confusing in that it does show that no previous warnings were given for offenses of the same nature. Irvin was verbally reprimanded, however, for three offenses of a different nature than the one at issue here. We do not, however, find the earlier warnings to be dispositive in distinguishing the other three employees' situations, and thus the error did not prejudice plaintiff.

■ Plaintiff's cumulative system of discipline is not without flexibility, and does not mandate mathematically precise application. For example, when plaintiff believes the employee's misconduct is not corrected by the suggested disciplinary action, or when the offense requires immediate discharge in the eyes of plaintiff, the progressive

disciplinary scheme need not be followed. As another example of the lack of precision plaintiff uses in applying its disciplinary scheme, we note that plaintiff considers such mitigating factors as an employee's willingness to apologize, and such aggravating factors as an employee's refusal to admit wrongdoing. The flexibility inherent in plaintiff's disciplinary scheme is also seen in its decision not to discipline Garcia for committing the level 3 infraction of sexual harassment. Plaintiff characterizes this as an occasional instance of leniency. Now, however, plaintiff attempts to rely, with mathematical precision, on the distinction between Irvin's work record showing three prior violations, and the other employees' work records showing no prior violations within the previous 12 months. A closer look at the employees' misconduct and work records reveals the pretextual nature of this argument.

Garcia fondled one nurse's thigh and made lewd remarks to several other women. Garcia was not disciplined. Ochoa grabbed the breast of a deaf-mute employee. Ochoa was suspended for five days. Surmaczynski repeatedly harassed one woman by following her, touching her intimately, and making sexual comments. He touched another woman's breast, and watched other women walk upstairs. Surmacynski was suspended for five days. Irvin commented to Paraday that she could rest on a gynecological table which would hold her legs spread apart. He was fired. The type of misconduct involved in the first three cases involved physically touching the women and thus was more serious than Irvin's conduct, yet he received a much harsher punishment. Plaintiff's characterization of Irvin's conduct as a "premeditated" and "systematic campaign of harassment against a single individual" is without support in the record. Plaintiff's characterization of the other three employees' conduct as "isolated incidents" in which they "impulsively misbehaved" is also not supported by the record. Nothing in the record indicates the April 26 comment by Irvin was premeditated.

We now look at plaintiff's explanation that Irvin's work record within the 12 months prior to the sexual-harassment charge was worse than the other three employees' records. Irvin received three prior warnings. The first warning was a level 1 verbal warning for not following proper procedure in filing a complaint with the State's Attorney's office. The second warning was a level 1 verbal warning for falling asleep at a meeting. The record shows that Irvin had given a written explanation that he came off work from an all-night shift, was taking allergy medication, and went to the meeting. After watching seven training films, he fell asleep. The third warning was a level 1 verbal warning for failure to wear his flashlight. Irvin's written ex-

planation was that he was not working in any areas outside where he would need a flashlight, and the flashlight worn in the correct position was painful due to an old bullet wound. He was told to wear the flashlight in a different position on his belt, and he evidently complied. We also note that this warning occurred only four days after plaintiff received notice of the original discrimination charge. These offenses cannot be equated with a charge of sexual harassment, and plaintiff did not treat them as progressive offenses. Instead of giving written warnings for the second and third level 1 offenses, plaintiff simply gave Irvin another verbal warning after each offense. The Commission was justified in finding that plaintiff's reasoning in attempting to distinguish the work histories of the other three employees was pretextual.

■ Finally, in way of an explanation, plaintiff argues that Irvin refused to apologize to Paraday, while the other three comparative employees all apologized. Absence of apology is not sufficient to justify the overwhelming difference in the types of discipline imposed on the four employees.

■ In regard to the comment Irvin made at the May 12 meeting concerning an engineer being Paraday's boyfriend, the Commission was also justified in finding that this was not sexual harassment. Plaintiff's employees each had a different version of the comment. Dunlap thought it was an irrelevant verbal attack; Pedziwiatr only recalled that Irvin "mentioned something about Susan Paraday dating an engineer"; and Heuel remembered Irvin stating that he would not make sexual comments to Paraday in the presence of the engineer. Irvin testified that he told Heuel that he would not "say something out of the way to a female [when] her boyfriend is right there." Paraday testified that Irvin had implicated one of the engineers as being her boyfriend. She felt he was "just hurt and had to get back at me." No matter which version is accepted, the remark by Irvin was intemperate, but it did not constitute an incident of sexual harassment.

■ In regard to the employee Campagna, we do not believe the Commission's finding that he is not similarly situated to be against the manifest weight of the evidence. Campagna had a prior suspension, while Irvin did not. Campagna was found guilty of a level 5 offense, which requires immediate termination, while Irvin was not so charged. The situations are not comparable.

■ Plaintiff also reasons that Irvin was fired because, *e.g.*, he had a "disruptive influence upon operations," gave his supervisors a difficult time, was a trouble maker, and was counterproductive to efficiency and morale. We find these reasons pretextual in the face of the

excellent ratings and job-performance reviews that Irvin received during the entire period that he worked for plaintiff. His most recent evaluation stated that his strengths were "job knowledge, dependability, adaptability, and ability to work with others." Nothing was listed in the area designated for skills needing improvement.

■■ With regard to the letter from Irvin's estranged wife, we agree with the Commission that it was inadmissible hearsay. It was also inadmissible because it was received subsequent to the termination and thus was irrelevant to plaintiff's reasons for discharging Irvin.

For these reasons, we hold that the Commission's decision that plaintiff discriminated on the basis of race and retaliation is not against the manifest weight of the evidence.

■■ Plaintiff next contends that the Commission erred in granting reinstatement and back pay to Irvin. The purpose of a back-pay award is to make the employee whole, and any ambiguities in determining the amount to be awarded should be resolved against the employer. (*Rasimas v. Michigan Department of Mental Health* (6th Cir. 1983), 714 F.2d 614, *cert. denied* (1984), 466 U.S. 950, 80 L. Ed. 2d 537, 104 S. Ct. 2151.) We see no abuse of discretion in awarding back pay here.

■■ If an employee proves he was discharged because of race, the burden is on the employer to demonstrate that he may not now resume his old job. (*McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817.) We do not question that an employer has the right to make a business judgment and we do not ask whether that judgment is sound. (*Kephart v. Institute of Gas Technology* (7th Cir. 1980), 630 F.2d 1217, *cert. denied* (1981), 450 U.S. 959, 67 L. Ed. 2d 383, 101 S. Ct. 1417.) However, we have determined that plaintiff has discriminated against Irvin, and we see no evidence that his reinstatement will deter plaintiff from preventing sexual harassment. This is especially true because plaintiff allowed the three comparative employees to continue in its employ. The Commission was justified in holding that discharge was not necessary to fulfill plaintiff's duty to take reasonably corrective measures to prevent a recurrence of the sexual harassment. We cannot say that the order of the Commission reinstating Irvin was an abuse of discretion.

■■ Plaintiff finally contends that the Commission erred in its award of attorney fees. Section 8—108(G) of the Illinois Human Rights Act authorizes the Commission to award reasonable attorney fees upon finding a civil rights violation. (Ill. Rev. Stat. 1985, ch. 68, par. 8—108(G).) A reviewing court will not vacate an award of attor-

ney fees absent a showing of abuse of discretion in making the award. (*Lurie v. Canadian Javelin Ltd.* (1982), 93 Ill. 2d 231, 443 N.E.2d 592.) The Commission found that plaintiff had failed to file any specific objections and thus awarded the fees recommended by the administrative law judge. We find no abuse of discretion in this holding.

For the foregoing reasons, the judgment of the circuit court of Cook County upholding the decision of the Illinois Human Rights Commission is affirmed.

Judgment affirmed.

McGILLICUDDY and WHITE, JJ., concur.