CHROMIUM CORPORATION, Petitioner and Cross-Respondent, v. THE HUMAN RIGHTS COMMISSION, Respondent (Joseph LaRocca, Respondent and Cross-Petitioner).

First District (4th Division)   No. 86—0674

Opinion filed December 24, 1987.

Christopher B. Nelson and John J. Murphy, Jr., both of Kovar, Nelson & Brittain, of Chicago, for petitioner Chromium Corporation.

Robert J. Peters and LeAnn Pedersen Pope, both of Frankel and McKay, Ltd., of Chicago, for respondent Joseph LaRocca.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, of counsel), for respondent Human Rights Commission.

PRESIDING JUSTICE McMORROW delivered the opinion of the court:

Joseph LaRocca (LaRocca) filed a charge of unlawful age discrimination against his former employer, Chromium Corporation (Chromium), before the Illinois Human Rights Commission (the Commission). The Commission adopted and affirmed the decision of the administrative law judge in favor of LaRocca, and Chromium appeals. We reverse on the ground that the evidence did not establish that Chromium terminated LaRocca's employment because of his age.

BACKGROUND

Chromium is in the business of designing liners for locomotive engines. LaRocca's employment at Chromium began at the company's Chicago plant in November 1977 when he was 50 years old. The Chicago plant manager, Laux (then age 37), initially interviewed LaRocca and recommended that he be hired. Later, the company president interviewed and hired LaRocca to work as third shift foreman. As third shift foreman, LaRocca worked from 11 p.m. to 7 a.m. and supervised six hourly employees who did the honing and plating of the liners.

For approximately the first year and a half of his employment,

LaRocca's immediate supervisor was Laux, the plant manager. Laux's initial review of LaRocca's performance, made in 1978, was positive. A year later, in May 1979, Laux's review of LaRocca was also complimentary, observing that LaRocca "handles hourly people much better in the past four months than ever before; 51 percent of goals completed."

Three months later, however, in August 1979, Laux gave LaRocca a poor evaluation. He stated that LaRocca showed "no motivation, does not know how to communicate with supervisors, peers or subordinates." Laux also said that he "fe[lt] the proper steps should be taken to replace this employee." Laux never discussed with LaRocca any of these evaluations.

When LaRocca began in November 1977, the other supervisory personnel at the Chicago plant were Gabryel (then age 56), day shift honing foreman; Fittanto (age 28), day shift plating foreman; Hendrix (age 50), maintenance foreman; Tavassoli (age 46), technical advisor; and Bemise (age 25), second shift foreman. In 1979, Laux and Bemise were transferred to Chromium's Texas plant. Gabryel replaced Laux as plant manager; Laux had suggested that Gabryel be given this promotion. Fittanto replaced Gabryel as first shift honing foreman and Mazzanti (age 33), took the position of first shift plating foreman. Sheehan (age 22), who began at Chromium as a hone operator in August 1977, was promoted to second-shift foreman. LaRocca remained as third shift foreman.

Gabryel's written evaluations of LaRocca in 1979 and 1980 were positive. Gabryel considered LaRocca a good employee, with a good production and safety record. He admitted that LaRocca had a few problems with other supervisors, but added that LaRocca was responsive to Gabryel's concerns and made improvement in relations with his peers. Gabryel also noted that other foreman had similar problems.

In January 1981, Gabryel received written congratulations on his performance as plant manager. A month later, however, his employment with Chromium was terminated. No reason for the discharge appears in the record. Laux stated at the hearing that he did not participate in the decision to discharge Gabryel.

Laux was transferred back to Chicago to reassume his position as plant manager. Upon his return, he began weekly supervisors' meetings. LaRocca's attendance at these supervisors' meetings required that he return to the plant after completing his regular shift. Initially Laux refused to compensate LaRocca for time spent at the meetings. After LaRocca advised Laux that Fittanto was compensated for time

spent at meetings held other than during Fittanto's normal shift, Laux agreed to pay LaRocca for time spent in the supervisors' meetings.

LaRocca testified that when he complained to Laux about coming in for the weekly meetings during off-shift time, Laux responded by asking LaRocca if he was "getting too old to hack the hours." LaRocca stated that Laux also remarked that he had given another employee an opportunity "at his age" to work in the plant even though the employee had only warehouse experience. Laux denied making either of these remarks at any time.

The incidents relied upon by Chromium as grounds for LaRocca's discharge occurred from March to September 1981. In March, Laux came to the plant one morning during LaRocca's shift. LaRocca was in his office, reading a book unrelated to his work. He told Laux that there was a "hot tank," *i.e.*, an electroplating tank that had reached excessive temperatures and caused the plating of the liners to be of poor quality. Laux inspected the plant and discovered a second hot tank. He also noticed that the platers were not wearing proper safety attire and that the plating area was messy. Laux told LaRocca "to pay close attention to the hot tanks." He also made a written report of the incident. He stated that he made such reports as a matter of general procedure.

Under cross-examination, Laux admitted that hot tanks were a recurrent problem throughout the plant on every shift during the spring and summer of 1981. He testified that other shift foremen also occasionally had two hot tanks throughout their entire shift. He admitted that although he reported the incident of the hot tanks in relation to LaRocca, he never wrote a personnel report regarding the other supervisors' problems with the hot tanks. Laux also admitted that he did not follow normal procedures by reporting the safety deficiency to the appropriate committee. He further stated that housekeeping was a recurrent problem on all the shifts.

In April 1981, Laux was instructed by his supervisors to make a formal assessment of the performance of all four of his foreman. Laux's written review of LaRocca noted that LaRocca had improved somewhat with respect to knowledge of processes and observed that LaRocca's primary weakness was in getting along with his peers and subordinates. Laux ranked LaRocca the least capable of the four foremen.

Laux went to the plant early one day to speak to LaRocca about the review. He again found LaRocca in his office reading a book. He told LaRocca to stop reading and to "get out in the plant." Laux also

told LaRocca not to go into the main office, which was regularly locked during the third shift. Laux wrote a note to LaRocca's personnel file regarding the incident.

LaRocca's annual salary review, done by Laux, occurred in May. Because Laux was dissatisfied with LaRocca's performance, he gave LaRocca a low salary increase. Laux felt that LaRocca's performance was inadequate because LaRocca read on the job and did not perform his supervisory duties. LaRocca was not pleased with the raise or the review. Laux told him that he would receive more of an increase if his performance improved in the next three to six months.

In late May, LaRocca complained to Laux's supervisor, Underwood, about LaRocca's low salary increase. A meeting was held between Underwood, Laux, and LaRocca. The minutes of this meeting show that Underwood told both Laux and LaRocca to improve their working relationship and that Laux was told to treat LaRocca in the same manner in which he dealt with the other foremen at the plant.

A few days after the meeting with Underwood, Laux went to the office in the morning and found a copy of LaRocca's resume in the xerox machine. Laux confronted LaRocca regarding this, telling him that he was not to use the xerox machine for personal business and that he should stay out of the main office. Laux also told LaRocca that it was against company policy to display salary amounts anywhere in the plant. LaRocca explained that he had been xeroxing his resume to "get prepared," because of the meeting with Underwood. LaRocca apologized and stated the infraction would not recur. On cross-examination, Laux admitted that he sometimes used the xerox machine for personal matters, as did the other foremen at the plant. He also admitted that he and the other three foremen sometimes read books, magazines, and newspapers during company time.

In July, Laux assigned to LaRocca the task of moving all company supplies to one centralized location on the second floor of the plant. Laux thought the job would take two to three weeks. After LaRocca began the task, Laux told him he was taking too long to complete it. LaRocca responded that he had inadequate manpower and had been denied access to the main office where certain supplies and necessary inventory documents were located. Laux said he would take this into consideration in assessing LaRocca's performance. However, Laux again became dissatisfied with LaRocca's progress and directed the other three foremen to complete the inventory relocation. In rebuttal, LaRocca testified that he had submitted a written suggestion to Laux, prior to July, that all plant supplies be relocated in a central spot. He also suggested a layout for this centralized supply area, as well as a

card system to keep track of supplies. Laux assigned the task to LaRocca.

Laux also found LaRocca's performance inadequate because LaRocca returned three days late from his August vacation. The delay caused problems for the other foremen, who had to work LaRocca's shift in addition to their own. When LaRocca returned, he explained to Laux that his delay had been caused by the air traffic controllers' strike then in progress. Laux stated that his only concern was that LaRocca had been late in returning from vacation. On another occasion, LaRocca returned a day late from a holiday. He explained to Laux that he had had certain mechanical difficulties with his boat trailer. He offered documents to corroborate his explanation for the delay. According to LaRocca, Laux refused to listen to the explanation.

The record indicates that Laux credited statements made to him by LaRocca's hourly employees to the effect that LaRocca did not always get along well with his men, sometimes worked on his boat during factory time, and occasionally left the plant before the end of his shift. LaRocca presented evidence at the hearing to indicate, and Laux admitted, that Laux and the other foremen occasionally played golf together on company time and attended sporting events.

Laux reevaluated LaRocca in August. The evaluation was negative. It noted that LaRocca read on the job and did not properly supervise employees. LaRocca responded to the review in writing, stating that the review was unjustified and biased. Later in August, LaRocca complained to two of Laux's supervisors about the August review.

In response to this situation, Chromium's director of human resources, Gerrak, came to Chicago from Texas. Both Gerrak and Laux stated at the hearing that the purpose of the meeting was to solve the problems between Laux and LaRocca. The meeting was scheduled for 10 a.m. on September 8. When Laux arrived that morning at approximately 7 a.m., Tavassoli told Laux that employees on LaRocca's shift said that LaRocca left the plant that morning at approximately 5 or 5:30 a.m., and that LaRocca had been bragging that he was going to sue the company for a million dollars.

Gerrak and Laux met before the 10 a.m. meeting and decided that LaRocca should be discharged. They credited the report from Tavassoli that LaRocca had left the plant before the end of his shift. When LaRocca came into the plant for the 10 a.m. meeting, Laux and Gerrak informed him that his employment was being terminated immediately. LaRocca was told that he was being discharged because he

had continued to be argumentative and disruptive and did not take proper direction from Laux as his immediate supervisor.

Laux testified at the hearing that he also discharged LaRocca because his production levels had dropped. Laux ran a "quality control contest" during the summer. The results of this contest showed that LaRocca's shift had a much higher percentage of errors in August. However, Laux admitted at the hearing that he could not remember if he had calculated the August percentages before or after LaRocca was discharged. He also admitted that it is not always possible to attribute certain errors to a particular shift. LaRocca stated that it is "physically impossible" to do so.

Following LaRocca's discharge, Fittanto remained in charge of the honing department and supervised the first shift, Mazzanti remained in charge of the plating department and supervised the second shift, and Sheehan was transferred to third shift foreman.

After LaRocca was discharged, Tavassoli was laid off because of a reduction in work at the plant. Laux testified at the hearing that the reduced work load was the result of a shift of most of the plating work to the Cleveland plant. Laux admitted under cross-examination that Mazzanti, the first shift plating foreman, was not laid off or discharged because of this reduction in plating work. Laux explained that a small amount of plating was still being done at the Chicago plant, and that this work did not require a person at the level of Tavassoli's educational background (*i.e.*, a bachelor's of science in chemistry).

The administrative law judge and the Commission determined that LaRocca had presented a *prima facie* case of age discrimination, in that he was qualified for the position of third shift foreman, was within the protected age group, and had been replaced by a younger employee (Sheehan, age 24) upon his discharge. The administrative law judge and the Commission also concluded that Chromium's reasons for discharge were pretextual, because the conduct for which LaRocca was discharged was either tolerated in younger employees or defensible in light of all the evidence. On this basis, the administrative law judge and the Commission ruled in favor of LaRocca on his charge of unlawful age discrimination. Chromium appeals.

OPINION

██ █ In order to prove that an employer has unlawfully discriminated against him on the basis of age, a discharged employee must establish a *prima facie* case, by the preponderance of the evidence, that he is a member of the protected class (*i.e.*, between the ages of 40

and 70), is qualified for the position from which he was discharged, and was replaced by a younger employee with qualifications similar to his own. Once this has been demonstrated, the employer must present legitimate, nondiscriminatory reasons for the discharge. The employee is then obligated to demonstrate that these reasons were pretextual and that the employee's age was, in reality, a dispositive reason for his discharge. See Ill. Rev. Stat. 1985, ch. 68, pars. 1—103(A), 2—102(A); *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817; *Pollard v. Rea Magnet Wire Co.* (7th Cir. 1987), 824 F.2d 557; *Loyola University v. Human Rights Comm'n* (1986), 149 Ill. App. 3d 8, 500 N.E.2d 639; *Department of Corrections v. Adams* (1986), 146 Ill. App. 3d 173, 496 N.E.2d 1138, *appeal denied* (1986), 113 Ill. 2d 558; *Board of Education v. Human Rights Comm'n* (1985), 135 Ill. App. 3d 206, 481 N.E.2d 994.

■ Upon review, the decision of the Commission is subject to reversal if it is against the manifest weight of the evidence. (See *Jackson v. Board of Review* (1985), 105 Ill. 2d 501, 475 N.E.2d 879.) The Commission determined that LaRocca had made out a *prima facie* case of age discrimination. It also concluded that the conduct by LaRocca upon which Chromium based its decision to discharge him was behavior that Chromium tolerated in younger employees or that was defensible under the circumstances. Evidence produced at the hearing demonstrated that LaRocca was qualified for the position of third shift foreman. He had several years' experience and training for this position, and his production and safety record while at Chromium were satisfactory. At age 54, he was in the protected age group. He was replaced by Sheehan, age 24, a foreman with similar qualifications. Also, LaRocca's conduct, which Chromium found unsatisfactory, was either tolerated in other foremen or defensible under the circumstances.

However, the evidence presented at the hearing failed to establish that LaRocca's age was, in reality, a dispositive reason for his discharge. As this court recently observed in *St. Mary of Nazareth Hospital Center v. Curtis* (1987), 163 Ill. App. 3d 566, "While the fact that the employer has given a false reason for the discharge is strong evidence of discriminatory intent, it is not dispositive. [Citation.] Several courts have stressed that the plaintiff 'must show not only a false reason but also a causal chain in which race or another forbidden criterion [such as age] plays a dispositive role.' " 163 Ill. App. 3d 566, 571, quoting *Pollard v. Rea Magnet Wire Co.* (7th Cir. 1987), 824 F.2d 557, 559.

LaRocca argues that circumstantial evidence demonstrated that

his age was a dispositive factor. He notes that Gabryel, age 60, was discharged as plant foreman one month after he was congratulated for outstanding performance and was replaced by Laux, then age 39. LaRocca urges that Tavassoli, age 50, was laid off because of a shutdown in the plating department, even though Mazzanti, who was plating department foreman and 35 years old, was not laid off. LaRocca also asserts that he himself was unfairly treated, and specifically notes that Laux asked LaRocca if he was getting "too old to hack the hours."

■ We are unable to conclude that these circumstances are sufficient to prove that Chromium discharged LaRocca because of his age. LaRocca presented no evidence to show that Gabryel was discharged because of his age, nor did his evidence dispute that the position filled by Mazzanti did not require the advanced educational background possessed by Tavassoli. Also, Laux recommended that LaRocca be hired at age 50 and suggested that Gabryel be promoted to plant manager at the age of 58. Both Gabryel and Tavassoli testified to good working relationships with Laux. Laux and Gerrak testified that LaRocca's age was not a factor in their decision to terminate his employment. The record shows that Chromium retained an older supervisor as well as older hourly employees after LaRocca was discharged and Tavassoli was laid off. In light of these circumstances, we conclude that the record does not substantiate that LaRocca was discharged because of his age. *Cf. Chipollini v. Spencer Gifts, Inc.* (3d Cir. 1987), 814 F.2d 893, *cert. dismissed* (1987), ___ U.S. ___, 97 L. Ed. 2d 815, 108 S. Ct. 26.

For the reasons stated, the order of the Human Rights Commission is reversed.

Reversed.

JIGANTI and JOHNSON, JJ., concur.