KRAFT, INC., DAIRY GROUP, Plaintiff-Appellee, v. THE CITY OF PEORIA *et al.*, Defendants-Appellants.

Third District No. 3—88—0035

Opinion filed December 15, 1988.

Glenn H. Collier, Corporation Counsel, of Peoria, for appellants.

Thomas G. Harvel, of Westervelt, Johnson, Nicoll & Keller, of Peoria, for appellee.

JUSTICE NASH delivered the opinion of the court:

Defendants, Jimmie Young, the City of Peoria, and the City of Peoria Fair Employment and Housing Commission (Commission), appeal from a judgment of the circuit court finding that the Commission lacked jurisdiction to act on a complaint filed by Jimmie Young against plaintiff, Kraft, Inc., Dairy Group (Kraft), because the action was preempted by Federal labor law. Alternatively, the trial court found that the Commission's decision that Jimmie Young was discharged from his employment with Kraft because of race discrimination was against the manifest weight of the evidence, and defendants also appeal from that judgment.

Young had worked in Kraft's sanitation department since May 1980 sweeping and washing floors, scrubbing walls, and washing the tanks that were used in the manufacture of Kraft's ice cream. In the fall of 1984, when Kraft experienced its regular, cyclical downturn in business, Young was transferred from the third to the second shift, and his duties were changed to also include the flavoring of ice cream. Young received four days' training, and after performing his new duties for about three weeks, Young, while performing his sanitation duties, hooked up a tank which contained 2,000 gallons of ice cream mix to a wash line which ran caustic cleaning solution into the tank. Ice cream valued at $28,000 to $32,000 was destroyed, and Young received a three-day suspension; when he returned to work, he was discharged.

Young was a member of the International Brotherhood of Teamsters, Chauffeurs and Helpers, Local Union No. 627, which had a collective bargaining agreement in effect with Kraft. The agreement contained a nondiscrimination clause and further provided that an employee could be suspended or discharged for just cause if the employee had received a written warning notice within the prior nine months. Young had received a warning letter within nine months of the incident which prompted his discharge for a thumb injury he had received when distracted while talking to another employee, Mike Ciaccio. Young lost work time because of this injury. Ciaccio did not receive a warning letter. The warning letter issued to Young for his thumb accident noted that this injury was the third reportable accident Young had in an eight-month period; two of the accidents occurred in 1983 and the other in 1984. On November 6, 1984, pursuant to procedures contained in the collective bargaining agreement, Young filed a grievance with Kraft "protesting my unjust discharge." Because Kraft, Young, and Young's union representative were unable to resolve his grievance, a joint conference committee hearing was held.

On January 9, 1985, the committee, which consisted of three union representatives and three employer representatives, two of whom were unconnected with Kraft but were representatives of employers who had a similar collective bargaining agreement in effect with the union, denied Young's grievance. That decision, pursuant to provisions of the collective bargaining agreement, was final and binding on the parties.

On November 8, 1984, while the grievance procedure was in process, Young filed a complaint with the Office of Equal Opportunity of the City of Peoria alleging that his discharge was racially motivated. Subsequently, that office filed a complaint with the City of Peoria Fair Employment and Housing Commission alleging that Kraft had discharged Young on account of his race in contravention of a Peoria city ordinance proscribing employment discrimination because of race.

The following evidence was presented to a hearing board designated by the Commission relative to Young's race discrimination claim based on his alleged disparate treatment from that accorded to other employees who were white. The first instance involved John Dempsey (white) and what the parties have described as the "hot well" incident. In September 1984, Dempsey was instructed to put remix into a vat. When he lifted the lid on the vat, it hit a valve which caused a liquid to enter the vat. While drinkable water would ordinarily first pour into the tank, Dempsey believed that the liquid was a caustic solution. He informed his supervisor, who tasted the remix, decided that the remix did not contain caustic solution, and instructed Dempsey to continue putting remix into the vat. However, a quality control inspector later decided to dispose of the approximately 40 to 50 gallons of remix in the vat. Dempsey did not receive a warning letter for this incident but, if he had, it would have been his second warning notice within a nine-month period. Neal Cargill, a union steward, testified that had the valve been properly tightened, caustic solution would not have run into the vat. Eugene Judd, operations manager, testified that it was the sanitation employee on duty, and not Dempsey, who was responsible to make sure that the valve was properly tightened, and Dempsey testified likewise.

Defendants introduced into evidence a copy of a "verbal warning" notice to Mike Ciaccio (white) dated September 1983, which stated that since his recall from layoff on March 2, 1983, he had three recordable accidents. A warning letter issued to Neal Cargill (white) in November 1983 was also introduced into evidence. It related to a mistake in mixing and referred to a similar incident which had occurred in August 1983 for which Cargill had received a verbal warning.

Eugene Judd, Kraft's operations manager, testified that in 1983 Kraft had the most lost time and recordable accidents in the dairy group. In early 1984, he had instituted a policy change requiring warning letters for all lost-time accidents relating to job negligence. Apparently, Kraft had been lax about issuing warning letters and Judd believed the policy change was necessary to reduce job-related accidents. Neal Cargill and Young also testified that there had been a company change regarding the issuance of warning letters, with Young stating that it was within the last couple of years that Kraft started issuing warning letters. Cargill testified that in the past Kraft would give a verbal warning and, after an employee received two or three warnings, he would receive time off. Recently, Kraft's new procedure was to issue a warning letter and, if the employee received a subsequent letter, the employee might be discharged.

The hearing board found that Young had established a *prima facie* case of discrimination because the evidence showed that Young was black; that he was discharged for conduct which similarly situated white employees had engaged in, but for which they did not receive commensurate disciplinary action; and that Young was replaced by a white person. The board further found that Kraft had failed to articulate nondiscriminatory reasons for its disparate treatment of Young and concluded that the sole reason for the disparate treatment was that Young was black. The Commission adopted the findings and conclusions of the hearing board and ordered Kraft to reinstate Young, with back pay, to his previous job position with all seniority rights and fringe benefits denied as a result of Kraft's alleged discrimination.

Thereafter, Kraft filed a complaint in the circuit court of Peoria County seeking review of the Commission's decision by common law writ of *certiorari*. (See, *e.g.*, *Quinlan & Tyson, Inc. v. City of Evanston* (1975), 25 Ill. App. 3d 879, 883, 324 N.E.2d 65.) The court reversed the decision of the Commission, finding that the Commission lacked jurisdiction to consider the complaint on the ground that Federal law preempted labor/management disputes, and, alternatively, the trial court found that the Commission's decision was against the manifest weight of the evidence.

Defendants contend first that Young's discrimination claim is not preempted because it is distinct from any claim he may have under the collective bargaining agreement and that resolution of his contractual claim through the grievance/arbitration process is not dispositive of his statutory claim for discrimination. We agree.

 Actions in a State court in which a violation of a labor contract provision is alleged are preempted by section 301 of the Labor

Management Relations Act (LMRA) (29 U.S.C. §185(a) (1982)), as are suits which require a court to interpret the meaning or scope of the terms of the employment contract. (*Allis-Chalmers Corp. v. Lueck* (1985), 471 U.S. 202, 210, 85 L. Ed. 2d 206, 215, 105 S. Ct. 1904, 1911.) To determine whether preemption has occurred in a case the proper inquiry is whether the State action involves nonnegotiable State-law rights which are independent of any rights established by the employment contract or whether the evaluation of the claim is "inextricably intertwined with consideration of the terms of the labor contract." (471 U.S. at 213, 85 L. Ed. 2d at 216, 105 S. Ct. at 1912.) In *Alexander v. Gardner-Denver Co.* (1974), 415 U.S. 36, 52, 39 L. Ed. 2d 147, 160, 94 S. Ct. 1011, 1021, the Supreme Court held that an arbitrator's resolution of a contractual claim is not dispositive of an employee's statutory claim under Title VII of the Civil Rights Act of 1964 because both claims have "legally independent origins and are equally available to the aggrieved employee." The Court noted Congress' intent to "allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes." 415 U.S. at 48, 39 L. Ed. 2d at 158, 94 S. Ct. at 1019.

■ Notwithstanding the above language, Kraft argues that *Alexander* does not apply to issues arising under Federal labor law *vis-a-vis* State antidiscrimination laws. We disagree. In its most recent case, the Supreme Court considered the issue of whether section 301 of the LRMA preempts a State claim for retaliatory discharge where there is a collective bargaining agreement in effect providing a contractual remedy for discharge without just cause. (See *Lingle v. Norge Division Magic Chef, Inc.* (1988), 486 U.S. 399, 100 L. Ed. 2d 410, 108 S. Ct. 1877.) There, the court noted the following regarding State-law claims for discrimination and retaliatory discharge in relation to contractual claims under a collective bargaining agreement which, we consider, refutes the argument that the principles embodied in *Alexander* do not apply to State antidiscrimination laws:

"The Court of Appeals 'recognize[d] that §301 does not preempt state anti-discrimination laws, even though a suit under these laws, like a suit alleging retaliatory discharge, requires a state court to determine whether just cause existed to justify the discharge.' 823 F2d, at 1046, n 17. The court distinguished those laws because Congress has affirmatively endorsed state antidiscrimination remedies in Title VII of the Civil Rights Act of 1964 ***. The operation of the antidiscrimination laws does, however, illustrate the relevant point for §301 pre-emption analysis that the mere fact that a broad contractual protection

against discriminatory—or retaliatory—discharge may provide a remedy for conduct that coincidentally violates state law does not make the existence or the contours of the state law violation dependent upon the terms of the private contract." (486 U.S. at ____, 100 L. Ed. 2d at 423, 108 S. Ct. at 1885.) In the present case, Young's discrimination claim has its origin in the public policy of Illinois and does not depend on the existence of the collective bargaining agreement. (*Cf. Gonzalez v. Prestress Engineering Corp.* (1986), 115 Ill. 2d 1, 10, 503 N.E.2d 308 (claim of retaliatory discharge for exercising rights under the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.1 *et seq.*) is not preempted because it has its foundation in Illinois public policy and the claim will exist notwithstanding the collective bargaining agreement).) Section 1—102(A) of the Illinois Human Rights Act declares that the public policy of this State is "[t]o secure for all individuals within Illinois the freedom from discrimination because of race *** in connection with employment." (Ill. Rev. Stat. 1985, ch. 68, par. 1—102(A).) Municipalities and counties are empowered to create local commissions so that the purposes of the Illinois Human Rights Act can be accomplished. Ill. Rev. Stat. 1985, ch. 68, par. 7—108(A).

The facts in *Moss-American, Inc. v. Fair Employment Practices Comm'n* (1974), 22 Ill. App. 3d 248, 317 N.E.2d 343, are analogous to this case. There, the defendants, who were black employees of the plaintiff, filed grievances through their union representative alleging that they had lost a bid for a job vacancy to an employee who had less seniority. An arbitrator found that the company had not violated the seniority provisions of the collective bargaining agreement and that the company had not acted in a discriminatory manner. Thereafter, the employees filed a complaint with the Illinois Fair Employment Practices Commission alleging that they had been discriminated against by the employer. After the Commission sustained the complaint, the employer instituted an administrative review action in the circuit court alleging that the Commission lacked jurisdiction to consider the complaint because of the prior arbitration. The court held that the prior arbitration did not preclude a subsequent action under the Fair Employment Practices Act (Ill. Rev. Stat. 1967, ch. 48, par. 858) because different considerations applied under the statute than under the collective bargaining agreement, and it was the arbitrator's duty to interpret the provisions of the collective bargaining agreement. 22 Ill. App. 3d at 255-56.

■■ ■ In the present case, Kraft, relying on *Carver Lumber Co. v. Human Rights Comm'n* (1987), 162 Ill. App. 3d 419, 515 N.E.2d

417, argues that the Commission's decision was substantially dependent upon an interpretation of the collective bargaining agreement because the Commission compared the disciplinary procedures in the agreement to the disciplinary measures actually taken against Young, and other employees, to determine whether Kraft had disparately treated Young because of race. Young's claim was that Kraft had applied its disciplinary policies preferentially for white employees and, consequently, the Commission had to consider the disciplinary procedures contained in the labor agreement and Kraft's application of those procedures. We conclude, however, that such consideration does not make Young's discrimination claim dependent on the collective bargaining agreement. (Cf. Lingle, 486 U.S. at ___, 100 L. Ed. 2d at 420, 108 S. Ct. at 1882 (a State-law claim is not rendered dependent on the labor agreement merely because the same factual considerations are necessary in analyzing the State-law claim and the just cause provision of a collective bargaining agreement).) Furthermore, the holding in *Carver* is inapposite to this case because there the premise behind the Commission's decision was that the employer should have ignored the seniority provisions of the labor contract. (162 Ill. App. 3d at 426.) From the forgoing, we conclude that section 301 of the Labor Management Relations Act does not preempt Young's discrimination claim under State law and that the trial court erred in so holding.

██ Defendants next contend that the trial court erred in finding that the Commission's decision was against the manifest weight of the evidence. In reviewing an agency's decision under common law *certiorari* the standard applied is whether there is any evidence in the record which fairly tends to support it. A reviewing court will not reweigh the evidence but may set aside the agency's findings if against the manifest weight of the evidence. (*Maddox v. Williamson County Board of Commissioners* (1985), 131 Ill. App. 3d 816, 822-23, 475 N.E.2d 1349.) We conclude that the trial court did not err when it found that the Commission's decision was against the manifest weight of the evidence.

██ █ The three-part analysis set forth in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817, has been adopted by Illinois courts when deciding employment discrimination claims. Under this analysis, the complainant has the burden of proving by a preponderance of the evidence a *prima facie* case of unlawful discrimination and, if proved, a rebuttable presumption exists that the employer unlawfully discriminated. An employer can then rebut this presumption by clearly articulating a legitimate, non-

discriminatory reason for its employment decision. If the employer satisfies this burden of production, the presumption of unlawful discrimination disappears and the complainant must prove by a preponderance of the evidence that the employer's proffered reason is not true but is a pretext for unlawful discrimination. The burden of proving unlawful discrimination remains with the complainant at all times. (*St. Mary of Nazareth Hospital Center v. Curtis* (1987), 163 Ill. App. 3d 566, 569, 516 N.E.2d 813.) A *prima facie* case of race discrimination is shown where similarly situated employees of a different race are treated more favorably. The key inquiry is not the severity of the discipline imposed but whether the same standards are used in disciplining employees of different races. *Loyola University v. Human Rights Comm'n* (1986), 149 Ill. App. 3d 8, 18, 500 N.E.2d 639.

▉ Defendants cite five instances where they claim Young was treated differently than similarly situated white employees. The first instance involved John Dempsey and the "hot well" incident. There, while Dempsey was putting remix into a vat he hit a valve which caused a fluid, which he believed to be caustic solution, to pour into the vat. Defendants argue that if Dempsey had received a warning letter for this incident he would have been discharged because he had received a warning letter within the prior nine months and, in light of the similarity between this incident and the incident which brought about Young's discharge, the fact that no warning letter was issued to Dempsey shows that Kraft favored its white employees.

We do not agree that the two cases were similar. First, the facts were that the accident would not have occurred if the valve Dempsey hit had been properly tightened, and that a sanitation employee, and not Dempsey, had the responsibility to tighten the valve. Second, there was uncertainty over whether Dempsey had actually caused a caustic solution to run into the vat. While Dempsey believed that caustic solution went into the vat, his supervisor apparently did not agree. The supervisor tasted the remix, decided that it did not contain caustic solution, and instructed Dempsey to continue putting remix into the vat. Kraft could well have decided that a warning letter was not warranted in light of this uncertainty. We note too that the loss resulting from Young's negligence in the present case far exceeded any loss attributable to the "hot well" incident. In Young's case, 2,000 gallons of ice cream valued at $28,000 to $32,000 were destroyed. When the "hot well" incident occurred, the vat contained about 40 or 50 gallons of remix.

Defendants also argue that, at a time when Dempsey had a warning letter in effect for a mistake in mixing ice cream, he was pro-

tected from making a similar mistake because, while his duties at that time included both sanitation and flavoring, Kraft only required him to perform sanitation duties. Defendants conclude that because Young was required to perform both sanitation and flavoring duties while he had a warning letter in effect, he was not similarly protected.

We note that there is very little evidence which shows that Dempsey was not required to perform the duties paralleling his job description. While defendants' argument on appeal is not entirely clear, their arguments at the hearing before the Commission shed some light. Young claimed that he did not receive enough training for the flavoring position, noting that he only received four days' training as compared to the two weeks of training Dempsey received. Young argued that his inadequate training contributed to his negligence because he was unable to properly perform both his old and new duties. The flaw in this argument is that Young was performing his sanitation duties, not flavoring, when he poured caustic solution into the ice cream, a job he had been performing since he commenced employment with Kraft in May 1980.

The next two claims of disparate treatment involve a perceived lack of uniformity in Kraft's procedure when issuing warning letters for careless job performance. Defendants argue that while Ciaccio had been involved in three reportable accidents, all of which occurred in 1983, he did not receive written warnings and was thus protected from discharge under the nine-month probationary period provision in the collective bargaining agreement. Defendants also cite Kraft's failure to issue a written warning letter to Cargill for his second mixing mistake in August 1983, arguing that if a letter had been issued, Cargill would have been subject to discharge for his mixing mistake in November 1983. Defendants' claims of disparate treatment ignore other crucial facts presented at the hearing. Eugene Judd testified that in 1983 Kraft had more lost-time and reportable accidents than did others in the dairy group. To rectify the problem, in 1984 Kraft instituted a policy change and began issuing warning letters for all lost-time accidents relating to job negligence. The fact that Young himself had not received warning letters for the two accidents he had in 1983, and the testimony of Young and Cargill, supports Kraft's assertion that warning letters were not given to anyone before 1984.

Defendants also argue that the circumstances surrounding Young's thumb injury show disparate treatment. There, Young and Ciaccio were talking and, as a result of the distraction, Young's hand slipped from a wrench, causing an injury to his thumb. Young was issued a warning letter but Ciaccio was not. The basis for the differ-

ence in treatment is apparent; Young lost work time because of his negligence while Ciaccio was guilty of no more than talking to a coworker. While Eugene Judd testified that Kraft could issue a warning letter for distracting another employee, he stated that he did not think such a letter would be upheld.

Kraft also addresses other issues relating to matters not ruled upon by the trial court which we do not consider. See *Watson v. City of Chicago* (1984), 124 Ill. App. 3d 348, 353-54, 464 N.E.2d 1100.

Accordingly, the judgment of the circuit court is affirmed where it found that the decision of the Peoria Fair Employment and Housing Commission was against the manifest weight of the evidence, and its alternate finding that the Commission lacked jurisdiction for reasons of preemption is reversed.

Affirmed in part; reversed in part.

REINHARD and UNVERZAGT, JJ., concur.