THE STATE OF ILLINOIS, Department of Corrections, Petitioner, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents.

Fourth District   No. 4—88—0193

Opinion filed January 26, 1989.

1034

Steven Nardulli, of Stratton, Dobbs, Nardulli & Lestikow, of Spring-field, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, So-licitor General, and Karen Michels Caille, Assistant Attorney General, of Chicago, of counsel), for respondent Human Rights Commission.

Mary Lee Leahy, of Leahy Law Offices, of Springfield, for respondent Lynda Savage.

JUSTICE SPITZ delivered the opinion of the court:

The Illinois Department of Human Rights (DHR) filed a complaint with the Illinois Human Rights Commission (Commission) as a result of charges filed with the DHR by respondent Lynda Savage against petitioner the Department of Corrections (DOC). The complaint al-leged that Savage had been subjected to sexual harassment by her im-mediate supervisor, Nicholas Howell, and was discharged in retalia-tion for opposing sexual harassment and for filing charges of unlawful discrimination with the DHR, in violation of the Illinois Human Rights Act (Act) (Ill. Rev. Stat. 1987, ch. 68, par. 1—101 *et seq.*). After a hearing, the administrative law judge (ALJ) recommended that Sav-age's complaint be sustained on both counts, that she be reinstated to her former position, and that she be awarded damages, attorney fees and costs. Thereafter, DOC filed exceptions to the ALJ's recom-mended order and decision. Upon review, the Commission affirmed and adopted the findings and recommendations of the ALJ and ruled that Savage had been subjected to sexual harassment in that Howell's conduct was "of a sexual nature" and had the purpose or effect of substantially interfering with Savage's work performance or creating an intimidating, hostile, or offensive working environment within the meaning of the Act. (Ill. Rev. Stat. 1987, ch. 68, pars. 2—102(D), 2—101(E)(3).) The Commission further ruled that Savage was discharged in retaliation for opposing the sexual harassment and for filing charges with the DHR. (Ill. Rev. Stat. 1987, ch. 68, par. 6—101(A).) The Commission ordered that Savage be reinstated to her former po-sition and that she be awarded damages including, *inter alia*, $81,465.27 in back pay, $23,131.50 for lost benefits, and $2,160 for medical expenses, as well as $18,068.75 for attorney fees, and other costs. The matter is now before this court on administrative review as

provided by section 8—111 of the Act. Ill. Rev. Stat. 1987, ch. 68, par. 8—111.

On appeal, DOC contends that the Commission's determination is against the manifest weight of the evidence and that the Commission's award of lost benefits, including sums for sick days, personal days, vacation, and FICA, constitutes double damages. For the reasons set forth below, we affirm.

As this appeal involves questions concerning the sufficiency of the evidence, a fairly detailed discussion of the testimony presented at the June 25, 1986, hearing in this cause is necessary. Respondent Lynda Savage testified in her own behalf that in August 1978, she became employed with the Illinois Department of Children and Family Services (DCFS) as a public information officer. Her supervisor in that job was Nicholas Howell. Savage worked for DCFS until September 1979, when she became employed with the Illinois Department of Law Enforcement as a public information officer. Savage stated that she transferred to the Department of Law Enforcement because Howell and his supervisor "did not get along well, and it created a lot of office tension that [she] wanted to get away from." She worked for the Department of Law Enforcement until October 1981, at which time she began working for DOC as a public information officer. Her supervisor during her employment with DOC was again Nicholas Howell, who was the chief public information officer for DOC.

In early 1982, Howell prepared an evaluation of Savage's work performance and recommended to DOC Director Michael Lane that she be given a 12% salary adjustment for performing her duties in a superior fashion. The salary increase was approved in June 1982. In the fall of 1983 Howell prepared another performance evaluation, rating Savage's work performance as "more than satisfactory" and requesting that she receive a salary increase. A salary increase of 7% was approved in September 1983.

Savage testified that during her employment with DOC, Howell referred to women in the following manner:

"If he met a [woman] that he was fond of, or that he liked, he would describe her in terms of physical appearance. For instance, he would say she had big boobs, she had a nice round ass that was good for pushing, I like her legs, she had a sensuous mouth, I like her doe eyes. If he was involved or had contact with a woman that he did not like, he would refer to her being on the rag, or raggin', or he would call her a bitch, a cunt or a twat."

Howell made these comments and used terms such as "motherfucker

and fuck" on a daily basis. At times, Howell directed such comments and terms at Savage and their secretary Rita Crifasi.

Savage then described several specific incidents involving Howell. Howell once brought a lingerie catalog containing "push-up bras, garter belts, and crotchless panties" to the office and asked Savage and Crifasi to help him select an outfit for his wife. He also asked Crifasi to make a long distance phone call to a pornographic service from his office. Further, Howell showed a picture around the office of himself with "a large-busted woman under each of his arms [and] he had his [hands] cupped over their breasts." Similarly, Howell brought a slide he had taken of "an inmate holding a cucumber coming out of his pants [that] looked like a large penis." On another occasion, Crifasi was discussing a television program she had seen about a baby born with a "forked tongue" and Howell remarked, "[H]ow would you like to french that baby?" Savage testified that Howell also referred to her daughter in a "derogatory" fashion, stating on one occasion that Savage should "buy her [daughter] a dildo for Christmas." On a subsequent occasion Howell saw a picture of Savage's daughter and asked Savage if she was raising her daughter to be a "porno star."

In January of 1984, Savage informed Howell that she and Crifasi had discussed the situation and if he did not refrain from using foul language, making sexually derogatory remarks, and making obscene pornographic references to her baby, she would take legal action against him. Howell told Savage to "go right ahead" and walked out of the room. Savage stated that Howell continued to use the language and make the remarks. Savage then met with William Craine, the Deputy Director of DOC's Bureau of Employee and Inmate Services. Savage informed Craine of various incidents involving Howell, and told him that the working situation was "very uncomfortable and intolerable, *** hoping that he could tell [her] some way to relieve the situation." Craine told Savage that "there wasn't much that [she] could do about the situation, that [she] just had to put up with it." Savage asked Craine if it would help to speak with Director Lane. Craine responded, "[W]hatever you do don't go talk to Director Lane" because it would anger Lane as "he does not want to hear what is going on between his employees." Craine informed Savage that he would talk to Howell and see what he could do. To Savage's knowledge, Craine did nothing about the situation.

Shortly thereafter Savage again spoke with Howell and asked him to stop using the foul language and stop making the sexually derogatory comments. The situation did not improve, rather "the language became worse in that it became more repetitive throughout the day."

Savage testified that the situation continued to deteriorate and on March 30, 1984, she met with Lynnette Jones, the assistant to the Director of DOC. Savage informed Jones of the incidents and asked to be assigned to a different position or office. Jones indicated that she was aware of the tension in the Public Information Office but did not know what had been causing it. Jones appeared sympathetic and concerned and informed Savage that she would discuss the situation with Director Lane that evening. Jones called Savage the next day and informed her that Director Lane would meet with her the following Monday. However, Lane did not meet with Savage at that time or anytime thereafter.

In March 1984, Savage spoke briefly with Jerry Butler, the Chief of DOC's Labor Relations Office, describing some of the incidents. Butler informed Savage that he was not surprised as his office was once located next to Howell's and he knew that Howell used such language and made such remarks. On April 3, 1984, Savage again asked Howell to refrain from making the objectionable comments and remarks.

Savage testified that prior to May 1984, she had never been disciplined in regard to her employment. Savage acknowledged that she was absent from work on May 4, 1984. According to Savage, she had advised Crifasi on May 3 that she would not be at work the following day. In a memo dated May 7, 1984, Howell informed Savage that her absence on May 4 was considered unauthorized because she had not notified the office that she would be absent that day. The unauthorized absence was placed in Savage's personnel file and she was docked a day's pay.

On May 7, 1984, Savage again spoke with Jerry Butler informing him of the various incidents and the disciplinary action taken against her and seeking his advice in rectifying the situation. Butler told Savage to first write a memo to Howell to see if they could work out an arrangement between the two of them. If this did not work, he suggested that she file a grievance with the DOC's Equal Employment Opportunity Commission Affirmative Action Office or file a complaint with the DHR. According to Savage, she filed a grievance against Howell for the unauthorized absence and met with him on May 10, 1984. During this meeting, Howell did not rule on the grievance but informed her that he had reviewed the information she presented, that he would consider her attitude adjustment over the next several months and might rescind the disciplinary action. Savage called Butler on May 17, 1984, to inform him of what had transpired. Butler told Savage that she had followed the proper procedure.

Savage testified that on May 25, 1984, she brought a tape recorder into the office and placed it uncovered on the middle of her desk. After this date, Howell discontinued his use of foul language and sexually derogatory remarks in Savage's presence. Savage testified that she never recorded any office conversations with the tape recorder.

On May 29, 1984, Savage filed a charge of sexual harassment with the DHR. DOC had notice of the charge, through its affirmative action officer, on or before June 5, 1984. On June 8, 1984, a DOC internal affairs investigator, David Brubaker, came to her office to question her and she asked his permission to tape-record their conversation. According to Savage, Brubaker "grabbed" the tape recorder out of her hand and stated, "[T]his is what I want to talk to you about." Brubaker then took the cassette tape from the recorder, informed Savage that she had been accused of committing felony eavesdropping and read Savage her rights.

On June 14, 1984, Howell informed Savage that she was being put on administrative leave and instructed her to "pack up [her] things, turn in [her] keys, leave, and he didn't want to see [her] in the building again." A personnel action form was introduced into evidence which indicated that Savage was placed on suspension pending discharge, effective July 12, 1984, for tape-recording phone conversations without authorization. Savage was ultimately discharged on August 15, 1984. She was told that the basis of her termination was conduct unbecoming an employee, to wit, that she had tape-recorded conversations.

Savage testified on cross-examination that her working relationship with Howell began to deteriorate in June 1983 when he became behind on an important project and started missing deadlines. Savage also stated in regard to the September 1983 performance evaluation that Howell had informed her that she had performed her work in a superior fashion but he only rated her work as "more than satisfactory" on the evaluation form. Savage maintained that Howell directed sexually derogatory comments to her. She indicated that on one occasion he stated: "[M]other-fucking son of a bitch, the day was perfectly fine until you in your usual incessant perverse nagging tone started in on me." Also, after Savage had returned from maternity leave he stated "that [her] ass looked better [then] than it ever had before." Savage acknowledged that Howell never "patted" her but stated that he once "pulled [her] to him and kissed [her] on the [cheek]." Howell was inebriated at the time.

On rebuttal, Savage stated that she brought a court reporter to

the predisciplinary hearing but that the reporter was ordered out of the hearing room. The confiscated tape, allegedly containing the voices of Crifasi, Howell, and Savage, was not produced at the hearing or anytime thereafter. Further, neither Savage nor her attorney was ever permitted to listen to the tape. Savage denied taking any measures to incite Howell or "force" him to supervise her.

Respondent's next witness was Joseph Mudra, chief of DCFS' Office of General Services. Mudra testified that he had worked with Savage and Howell when they were employed by DCFS. During this time he heard Howell make derogatory comments about women, calling them "cunts" and "bitches." Mudra testified on cross-examination that he did not hear Howell direct any such comments to Savage.

Lynnette Jones testified as an adverse witness that she was the assistant to the Director of DOC. Jones stated that in March 1984, Savage informed her of the language used and comments made by Howell. Jones told Savage that she would attempt to arrange for her to meet with the Director. According to Jones, she was unable to schedule a meeting and Savage did not pursue the matter any further. Jones denied that she telephoned Savage to inform her that a meeting had been arranged. Jones subsequently informed the Director about what Savage had told her but took no further action in regard to the situation. Jones testified on cross-examination that during the conversation with Savage, Savage spent more time discussing the disorganization of the office. Jones felt Savage was attempting to get Howell's job and was contributing to the disorganization of the office. Jones did not believe it was the Director's responsibility to meet with Savage.

William Craine, Deputy Director of DOC's Bureau of Employee and Inmate Services, testified as an adverse witness. Craine stated that Savage met with him in January 1984. During the meeting Savage complained to him about Howell's language toward her, remarks he had made, and incidents that had occurred. She also expressed frustration over the lack of organization in the Public Information Office and the work she was assigned. According to Craine, Savage told him that she was doing things to get Howell's attention and to force him to "deal" with her. Craine suggested that Savage try to resolve the situation with Howell and to seek outside help only as a last resort. Craine took no action with regard to the situation.

Nicholas Howell, called as an adverse witness, testified that he was chief of DOC's Public Information Office and was Savage's direct supervisor during the period from October 1981 to August 1984. Howell acknowledged that in June 1982 he recommended a salary ad-

justment of 12% for Savage based upon her superior work performance. He also recommended a salary adjustment for Savage in September 1983 based upon her above satisfactory work performance. Further, he acknowledged that she showed exceptional attention to the duties of the office when he was away on business. Howell was questioned about his memo concerning Savage's unauthorized absence and acknowledged that she was entitled to "sick time" and that she verified her absence with reports from two physicians. Howell admitted that he "probably" used the words "fuck" and "motherfucker" on the job. He also acknowledged that he had referred to women as "being on the rag" and "raggin' it." He denied using any other foul language or making any other sexually derogatory remarks. Further, he denied making any sexual references toward Savage's daughter. Howell maintained that Savage never objected to his language and never asked him to stop making any comments or remarks. Howell stated that it was his decision to place Savage on administrative leave. Howell also indicated that he had seen a tape recorder on Savage's desk but did not think it unusual as "that was part of her interviewing job and duties." Howell was asked whether Savage's discharge related to tape-recording and he responded: "I would say so."

Jerry Butler testified as an adverse witness that he was the administrator of employee services with DOC. Butler stated that Savage came to him in the spring of 1984 to complain about Howell's language and comments. Savage also spoke with Butler by phone concerning incidents involving Howell. Butler acknowledged that during one of his conversations with Savage he discussed the options available to her, including her option to file a grievance. Butler did not investigate the matter or take any action because he believed the "burden [was on Savage] to pursue the concern." Butler testified on cross-examination that Savage criticized Howell's work performance and was frustrated in her job because she did not believe she was getting the credit she deserved.

Barbara J. Nunn testified for respondent that she had previously worked as Howell's secretary in the Public Information Office for two years. Savage was also employed in the Public Information Office during that time. While working with Howell, Nunn heard him use foul language and describe women in a "real derogatory manner." Howell occasionally used such language as "cunt," "raggin' it," and "bitch," and he used the terms "fuck" and "motherfucking" on a daily basis. Nunn stated on cross-examination that she did not hear Howell make any sexually explicit remarks to Savage but that in talking to her he would normally "say the word fuck several times." Nunn stated on

redirect examination that Howell's conduct "got on her nerves" and that she was "relieved" when she was transferred to another office.

The first witness called by DOC was Rita Crifasi, the secretary for DOC's Public Information Office. Howell was her supervisor. Savage was working in the office at the time Crifasi was hired and went on maternity leave shortly thereafter. Crifasi testified that after Savage returned from maternity leave, Savage and Howell "got along pretty well" and that Howell "blew up at" Savage on only one occasion. She stated that Howell used the words "fuck" and "goddamn" several times a week and used the term "cunt" on one occasion. Crifasi could not recall Savage ever telling her that she was offended by Howell's language. Nor could she remember an occasion when Savage asked Howell to stop making the offensive remarks. Crifasi testified that in October 1983, Howell and Savage "just weren't as friendly as they had been." This was shortly after Savage had received a performance evaluation. Crifasi believed that Savage was unhappy with the evaluation and noticed that Savage had a change in her attitude toward Howell, and a change in work habits. Crifasi was again asked if Savage had ever complained to her about Howell's language and this time stated: "I believe once or twice she said that she just didn't like the language he was using." She then admitted that she had discussed Howell's language with Savage several times.

Regarding Savage's absence from work on May 4, 1984, Crifasi stated that Savage called the office before noon that day and informed Crifasi that she did not have a baby-sitter and wouldn't be in to work. The day before, Savage had mentioned to Crifasi that there had been a fire at her child's day care center and she did not know if they would be able to care for her child the next day. Crifasi was aware that Savage kept a tape recorder on her desk and stated to Savage "I hope you are not using it on me." According to Crifasi, Savage responded: "Oh, no, I am not, *** I am using it to catch [Howell]." Crifasi informed Howell about the tape recorder and subsequently gave a statement concerning the recorder to a DOC investigator. Crifasi testified that she listened to the tape after it had been confiscated by the investigator and recognized the voices on the tape as hers and Savage's. Crifasi testified on cross-examination that in June 1984, she applied for Savage's position. Crifasi acknowledged that on one occasion Howell left a message for her to return a call. When she placed the call she heard a "girl breathing into the phone" and talking suggestively.

DOC's next witness was Lynnette Jones. Jones again related the details of her March 1984 conversation with Savage. She indicated

that this was not the first time Savage had talked to her about Howell. Savage first complained about Howell's language and comments in the fall of 1983. Thereafter, she talked to Jones approximately three times a week about how upset and frustrated she was. Savage also spoke with Jones about the disorganization of the office and her dissatisfaction with the 1983 evaluation. Jones saw Howell on a daily basis and told him about her conversations with Savage. Jones testified that she had heard Howell swear but that it was not a normal part of his conversation. Jones testified on cross-examination that no one investigated or took any action in regard to Savage's complaints about Howell. Jones stated that DOC had many employees and the Director did not have the time to meet with every disgruntled employee.

The next witness was Nancy Tucker, a secretary for the Director of DOC. Tucker testified that she had known and worked with Savage at DOC since 1981. Tucker had daily contact with Savage at work until the time Savage was discharged. Savage talked to Tucker about her disappointment with the 1983 performance evaluation. Subsequently, Tucker began to notice more friction between Howell and Savage. She had a number of conversations with Savage about Howell, but she could not recall Savage ever mentioning Howell's offensive language or remarks. Tucker stated that Howell "cusses," but in her opinion, his language was not obscene.

Nicholas Howell, called as a witness for DOC, testified that he had known Savage for eight years. He first met Savage when they were employed in the Public Information Office at DCFS. Howell testified that he was her immediate supervisor at DCFS and their relationship was professional and friendly. During this employment he frequently used the word "fuck" in Savage's presence but did not intend it to have sexual connotations. Savage never told Howell that his language was offensive while they were working at DCFS. Howell became employed with DOC's Public Information Office in May 1981, and Savage was hired in October 1981. According to Howell, Savage's work performance during her first year with DOC was exceptional and in 1982 he recommended to the Director that she be given a 12% raise. Savage subsequently went on maternity leave. When she returned from leave in 1983 she "performed her duties well enough" but her work was "not comparable to the previous time." Because her work "had slipped" Howell rated her as only "more than satisfactory" in her 1983 performance evaluation.

Howell testified that Savage became dissatisfied with her job for various reasons during the summer of 1983. By January of 1984 there

was a high level of tension and friction between them. Savage began to take long lunch hours and was not performing her duties properly and refused to work overtime. Howell testified that he spoke with Savage several times about her deteriorating performance and suggested that she make better use of her time. He also suggested that she talk to William Craine, a psychologist and Deputy Director of DOC's Bureau of Employee and Inmate Services. Thereafter, Savage's performance continued to deteriorate and the tension escalated. Howell continued to "counsel" Savage about her performance every four to six weeks. Howell was aware that Savage kept a tape recorder on her desk. After the tape was confiscated and played back by the investigator, Howell recognized his voice on the tape. Howell denied making sexual or obscene comments about Savage's daughter. He acknowledged that there was a verbal altercation between the two of them in January 1984, but stated that he apologized after the incident. According to Howell, Savage never spoke to him or complained about his language and comments and she never threatened to file a grievance or complaint against him. He admitted that Barbara Nunn did ask him to "clean up his language."

Dave Brubaker testified that he was an internal security investigator for DOC. On June 7, 1984, Deputy Director Robert Klemm contacted Brubaker and asked him to conduct an investigation of the Public Information Office. He was told to meet with Howell to discuss the situation in the office. During this meeting, Howell informed him that Savage had been tape-recording conversations in the office and suggested that he speak with Rita Crifasi for additional information. He then interviewed Crifasi and was informed that Savage had a tape recorder on her desk and Crifasi believed that Savage had been recording Howell's conversations. Brubaker again met with Howell and suggested that he "be observant as to if he could determine any conversations with her in fact there would be a tape recorder in her possession or near her desk or on her desk and as soon as possible after that situation would take place for him to contact [Brubaker]." Howell phoned Brubaker the following day and informed him that Savage had possibly recorded a conversation he had with her. Brubaker then proceeded to the Public Information Office and confiscated the cassette tape. Savage informed Brubaker that she had the tape recorder for her protection. Brubaker, Howell, and Crifasi subsequently listened to the tape. Howell identified his voice as one of the voices on the tape and Crifasi identified her voice and Savage's.

DOC also called Edward Jordan, DOC's labor relations administrator, to testify. In June 1984, Jordan received a memo from Howell,

requesting Jordan to conduct an employee review hearing. Thereafter, Jordan notified Savage of the information relating to the predisciplinary hearing, conducted an investigation of the matter and ultimately conducted the hearing. Jordan discussed what transpired during the predisciplinary hearing. Jordan indicated that Savage did not testify at the hearing or present any evidence in mitigation other than a sworn affidavit. At the conclusion of the hearing Jordan found that the charges against Savage had been proved and that discharge was appropriate. Jordan learned during the hearing that Savage had filed a complaint with the DHR. Jordan testified on cross-examination that none of the witnesses at the hearing were sworn and a court reporter was not present. Jordan acknowledged that Savage's refusal to testify did influence his decision and that the cassette tape was not produced at the hearing.

Following the hearing, the ALJ issued a recommended order and decision. The ALJ determined that Savage had proved by a preponderance of the evidence that she was subjected to sexual harassment by her immediate supervisor, Nicholas Howell, while employed by DOC. (Ill. Rev. Stat. 1987, ch. 68, pars. 2—102(D), 2—101(E)(3).) The ALJ found that Howell's conduct was "sexual in nature" within the meaning of the Act. The conduct considered by the ALJ included: (1) two incidents involving sexual references to Savage's daughter; (2) Howell's comment about Savage's buttocks; (3) a photograph Howell brought to the office of Howell with his hands on clothed women's breasts; (4) a phone call to a pornographic phone service; (5) derogatory comments about women and their body parts; and (6) the use of two types of obscenities. Regarding the obscenities used by Howell, the ALJ classified the words "fuck" and "motherfucker" as "general sexual" terms and the words "cunt," "bitch," and "raggin' it" as "gender specific" terms. The ALJ found that Howell used the general sexual terms as expletives and that such use did not amount to sexual conduct in this particular instance. However, he found that Howell's use of the gender specific terms and the other incidents just outlined did constitute "conduct of a sexual nature." The ALJ concluded that the aforementioned conduct created a hostile and offensive working environment and substantially interfered with Savage's work performance.

The ALJ also determined that Savage had established a *prima facie* case of retaliatory discrimination. (Ill. Rev. Stat. 1987, ch. 68, par. 6—101(A).) The ALJ found that Savage opposed sexual harassment; the opposition took the form of repeated complaints; she participated in the Act's remedial procedures by filing a charge; and shortly

after DOC received notice of the charge Savage was discharged. The reason articulated by DOC for Savage's discharge was her unbecoming conduct in illegally tape-recording conversations. The ALJ found "the facts are such that I can draw no conclusion but that the discharge for taping a conversation is pretext." The ALJ reasoned that the manner in which the complaint was acted upon and the circumstances of the hearing suggested bad faith and destroyed any credibility to be attached to the articulated reason.

■■ ■ The ALJ's findings and decision were subsequently affirmed and adopted by the Commission. Under the Act, the Commission's findings of fact shall be sustained unless the reviewing court determines that such findings are contrary to the manifest weight of the evidence. (Ill. Rev. Stat. 1987, ch. 68, par. 8—111(A)(2).) Moreover, judicial review under the Act is to be in accordance with the provisions of the Administrative Review Law (Ill. Rev. Stat. 1987, ch. 110, par. 3—101 *et seq.*). (Ill. Rev. Stat. 1987, ch. 68, par. 8—111(A)(1).) Pursuant to the Administrative Review Law, the agency's, here the Commission's, findings of fact shall be held to be *prima facie* true and correct. (Ill. Rev. Stat. 1987, ch. 110, par. 3—110.) The decision of the Commission is not to be overturned unless it is contrary to the manifest weight of the evidence. *Loyola University v. Human Rights Comm'n* (1986), 149 Ill. App. 3d 8, 500 N.E.2d 639; *K mart Corp. v. Human Rights Comm'n* (1984), 129 Ill. App. 3d 842, 473 N.E.2d 73; *Burnham City Hospital v. Human Rights Comm'n* (1984), 126 Ill. App. 3d 999, 467 N.E.2d 635.

■ DOC first contends that the Commission's determination that Savage was subjected to sexual harassment is contrary to the manifest weight of the evidence. The Illinois legislature has adopted a definitive rule on employer liability for sexual harassment. (See *Board of Directors, Green Hills Country Club v. Human Rights Comm'n* (1987), 162 Ill. App. 3d 216, 514 N.E.2d 1227.) Section 2—102(D) of the Act provides, in pertinent part, that it is a civil rights violation "[f]or any employer, employee, agent of any employer, employment agency or labor organization to engage in sexual harassment." (Ill. Rev. Stat. 1987, ch. 68, par. 2—102(D).) The Act defines sexual harassment as:

> "[A]ny unwelcome sexual advances or requests for sexual favors or *any conduct of a sexual nature when* (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) *such con-*

*duct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment."* (Emphasis added.) Ill. Rev. Stat. 1987, ch. 68, par. 2—101(E).

██ As indicated above, the ALJ found that Howell's conduct was of a sexual nature and had the purpose or effect of substantially interfering with Savage's work performance or creating an intimidating, hostile, or offensive working environment. (Ill. Rev. Stat. 1987, ch. 68, par. 2—101(E)(3).) A review of the ALJ's findings and determination together with the evidence presented at the hearing in this cause reveals that DOC's contentions are unpersuasive. DOC's primary assertion is that Howell's conduct was not actionable because it was not directed at Savage. This assertion is incorrect. As the hearing officer expressly found, and supported by the record, several comments were directed to Savage in particular and other comments were directed to her about her daughter. DOC's next assertion is that Howell's conduct was not "sexual in nature" also lacks merit. The ALJ acknowledged that Howell's use of general sexual terms such as "fuck" and "motherfucker" as expletives did not amount to sexual conduct in this instance. He found, however, that Howell's use of gender specific terms such as "cunt," "bitch," "twat," and "raggin' it," together with other specific incidents did constitute "conduct of a sexual nature." These incidents included: sexual references to Savage; sexual references to Savage's daughter, a photograph of Howell with his hands on clothed women's breasts; a phone call to a pornographic phone service; and derogatory comments about women and the female anatomy. In light of the foregoing and other evidence presented at the hearing, the ALJ could have properly concluded: that Howell used offensive terms and remarks to describe sexual acts, bodily functions, and parts of the female anatomy; that these comments were made on the job; and that the comments were directed at Savage, her daughter, and other women. This conduct, coupled with the specific incidents outlined above, constituted "conduct of a sexual nature" under the circumstances here. Ill. Rev. Stat. 1987, ch. 68, par. 2—101(E)(3).

██ Further, we are unpersuaded by DOC's next contention that Howell's conduct did not create a hostile and offensive working environment. The ALJ considered the surrounding circumstances and concluded "it does not take a prude to find [the remarks] offensive and the evidence shows that for Savage this conduct created a hostile environment." The ALJ rejected DOC's contention that the remarks were casual and isolated. He noted that Howell's repeated use of the language after Savage's numerous requests that he cease "suggests

either a deliberate course of causing discomfort or at least a deliberate and knowing disregard of her objections." The ALJ also rejected DOC's contention that the comments affected both sexes equally. He stated that Howell's use of such terms as "cunt," "twat," and "bitch" were cases of "intentional name-calling," were used when Howell was displeased with a woman's behavior and were chosen because of the expression of animosity they allow. He pointed out that there was no evidence Howell used any terms describing male body parts or uniquely male bodily functions. In conclusion, the ALJ stated:

"Ultimately this is a case where the line between tastelessness and harassment is crossed. The terms used consistently and over objection created a hostile environment for Savage which had to play a role in the deterioration of her work and emotional state."

These findings and conclusion are amply supported by the record. Based upon a review of the evidence and consideration of the surrounding circumstances, including: the office environment; the context in which the comments were made; the nature and frequency of the comments; and Howell's failure to desist after repeated requests to do so, we agree with the ALJ's determination that Howell's conduct created a hostile and offensive working environment and substantially interfered with Savage's work performance. Ill. Rev. Stat. 1987, ch. 68, par. 2—101(E)(3).

■ DOC's remaining contentions relate to credibility determinations made by the ALJ. These findings are also supported by the evidence. The ALJ determined that Savage's testimony was credible based upon her demeanor, the nature of her allegations, and the evidence of both parties concerning her consistent complaints about the conduct over time. He also found Nunn's testimony to be credible based upon her demeanor and the fact that she had no discernible interest in favor of Savage. The ALJ did not find DOC's witnesses as credible since most were high level officials in DOC with an obvious bias or interest. It is not the function of the reviewing court to reassess the credibility of the witnesses or to reweigh the evidence and decide what is the preponderance of the evidence, but rather to follow the standards for administrative review that the Commission's decision will not be set aside unless it is contrary to the manifest weight of the evidence. (*Eastman Kodak Co. v. Fair Employment Practices Comm'n* (1981), 86 Ill. 2d 60, 426 N.E.2d 877.) Accordingly, as we have concluded that the Commission's decision that Savage was subjected to sexual harassment in violation of section 2—102(D) of the Act (Ill. Rev. Stat. 1987, ch. 68, par. 2—102(D)) was not against the

manifest weight of the evidence, it will not be disturbed.

■ DOC next contends that the Commission's determination that Savage was discharged in retaliation for filing a claim with the DHR (Ill. Rev. Stat. 1987, ch. 68, par. 6—101(A)) is against the manifest weight of the evidence. Under section 6—101(A) of the Act, it is a civil rights violation:

"[F]or a person, or for two or more persons to conspire, to:
* * * Retaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be sexual harassment in employment, unlawful discrimination or sexual harassment in higher education or has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this Act." Ill. Rev. Stat. 1987, ch. 68, par. 6—101(A).

■ In analyzing employment discrimination actions, such as the instant one, under the Act, Illinois courts utilize the three-step analysis set forth in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817. (See *Village of Oak Lawn v. Illinois Human Rights Comm'n* (1985), 133 Ill. App. 3d 221, 478 N.E.2d 1115; *Freeman United Coal Mining Co. v. Fair Employment Practices Comm'n* (1983), 113 Ill. App. 3d 19, 446 N.E.2d 543.) Initially, the employee has the burden of proving by a preponderance of the evidence a *prima facie* case of unlawful discrimination. By establishing a *prima facie* case, the employee creates a rebuttable presumption that the employer unlawfully discriminated against him or her. (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.) The employer must then clearly set forth a legitimate, nondiscriminatory reason for its employment decision in order to successfully rebut the presumption of unlawful discrimination. (*Texas Department of Community Affairs*, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.) If the employer is successful, the presumption of unlawful discrimination is no longer present in the case. (*Texas Department of Community Affairs*, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.) The employee must then prove by a preponderance of the evidence that the legitimate reason offered by the employer was not the true reason underlying its employment decision and that it was only a pretext. This then merges with the employee's ultimate burden of proving whether the employer unlawfully discriminated. *Texas Department of Community Affairs*, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089; *Village of Oak Lawn v. Human Rights Comm'n* (1985), 133 Ill. App. 3d 221, 478 N.E.2d 1115.

The following evidence presented at the hearing supports the Commission's determination and demonstrates that DOC's contentions lack merit. Savage complained about Howell's language repeatedly in late 1983 and in 1984. During this time Savage made complaints to Barb Nunn, her former secretary, about Howell's language. After the 1983 evaluation Savage also complained to secretary Rita Crifasi about Howell's language. In January 1984, Savage asked Howell to stop making remarks about women and to refrain from using foul and offensive language. In early 1984 Savage spoke to William Craine, Deputy Director of DOC. She informed him of the remarks concerning her daughter and Howell's language and comments about women. In March 1984, Savage spoke with Jerry Butler, head of Labor Relations of DOC, concerning Howell's language. On March 30, 1984, Savage informed Lynnette Jones of the remarks Howell made concerning her daughter and complained about his language. On April 3, 1984, Savage again talked to Howell, expressed objection to his language, and asked him not to refer to her daughter. On May 7, 1984, Savage met a second time with Butler.

On May 25, 1984, Savage brought a cassette tape recorder to the office which she placed on her desk in open view. Savage told Crifasi that she was going to tape conversations with Howell when they were alone to protect herself. On May 29, 1984, Savage filed her charge of sexual harassment. DOC, through its affirmative action officer, had notice of the charge on or before June 5, 1984. Crifasi informed Howell of the presence of the tape recorder and of Savage's intention to tape his conversations. By June 6, 1984, Howell was aware of the presence of the recorder. Around this time Crifasi filed an application for the position held by Savage. Howell contacted the Internal Security Division of DOC regarding the tape recorder. An investigator with the division, Dave Brubaker, declined to take action on the grounds that there was insufficient evidence that Savage had illegally taped any conversations. On June 8, 1984, after engaging Savage in a conversation, Howell contacted Brubaker and told him that there was reason to believe that Savage had taped a conversation which he had with her. Upon this representation Brubaker began an investigation. Brubaker came to the office where Savage worked and told her he wanted to talk about the tape recorder. She turned on the tape recorder and asked him if she could tape their conversation. He turned the tape recorder off and removed the cassette tape, which he kept over her objection.

On June 14, 1984, Howell wrote a memo to Edward D. Jordan informing him that he had been selected to serve as the prediscipinary

hearing officer on charges of illegal eavesdropping against Savage. A hearing was held on June 26, 1984, and Howell presented the DOC's case. The tape was not produced at the hearing or anytime thereafter. None of the witnesses at the hearing were sworn and a court reporter was not permitted to be present. At the conclusion of the hearing, Jordan found that eavesdropping had occurred. The decision was based upon the Crifasi testimony that Savage intended to tape Howell, Howell's testimony he had seen something which led him to believe he was being taped by Savage, Brubaker's testimony that he seized the tape, and Crifasi's and Howell's testimony of recognizing their voices on the tape. Jordan recommended Savage be discharged.

■ In view of this evidence and other evidence presented at the hearing in this cause, the ALJ could have properly concluded that Savage established a *prima facie* case of unlawful discrimination. The record establishes that Savage opposed the sexual harassment by making repeated complaints to DOC personnel and Howell. She then filed a charge of discrimination with the DHR. Shortly after DOC received notice of the charge, Savage was discharged. A *prima facie* case of discrimination based on retaliation may be established by showing a short span between the time a competent employee filed a charge of employment discrimination or otherwise opposed discrimination practices, and the time of the employer's adverse action. (See *Alexander v. Illinois Fair Employment Practices Comm'n* (1980), 83 Ill. App. 3d 388, 403 N.E.2d 1271; *Weigel Broadcasting Co. v. Hammer* (1978), 67 Ill. App. 3d 805, 384 N.E.2d 811; *Loyola University v. Human Rights Comm'n* (1986), 149 Ill. App. 3d 8, 500 N.E.2d 639.) Thus, Savage sustained her burden of proving by a preponderance of the evidence a *prima facie* case of retaliatory discrimination.

The reason offered by DOC for Savage's discharge was her unbecoming conduct in illegally tape-recording conversations. The evidence presented at the hearing below clearly demonstrates that this was not the true reason underlying Savage's discharge and that it was only a pretext. The highly questionable circumstances surrounding the alleged tape recording of Howell's conversation, the confiscation and failure to produce the tape, and the disciplinary hearing that followed negated any credibility to be attributed to the reason offered by DOC. Thus the Commission's decision that Savage was discharged in retaliation is amply supported by the record and will not be set aside.

DOC's final contention is that the Commission's award of lost benefits, *e.g.*, including sums for sick days, personal days, vacation, and FICA, in addition to the award of back pay resulted in a double award.

Respondent's expert, Thomas William Langford, provided calculations on the issue of damages. Langford, an economic and management consultant, calculated Savage's back pay based upon her annual salary. He made separate calculations for lost benefits, including: sick days, personal days, vacation, and FICA. DOC did not dispute these calculations and offered no evidence or explanation to the contrary. The ALJ recommended that because Savage had been unlawfully discharged she be awarded back pay and lost benefits pursuant to section 8—108(C) of the Act. (Ill. Rev. Stat. 1987, ch. 68, par. 8—108(C).) The award was based upon Langford's calculations. In its exceptions to the ALJ's recommended order and decision, DOC argued that the lost benefits were part of Savage's annual salary and were therefore included in the backpay award. The Commission rejected this contention, finding that under section 8—108(C), Savage was entitled to lost benefits, in addition to her salary. The Commission stated that "State employees may receive compensation if they do not use sick, and vacation days during their employment." The Commission emphasized that the purpose of the damage award is to put the claimant in the position she would have been but for the discriminatory act and awarded Savage, *inter alia*, $81,465.27 for back pay and $23,131.50 for lost benefits.

▓▓ Section 8—108(C) of the Act provides in relevant part:

"Upon finding a civil rights violation, a hearing officer may recommend and the Commission *** may provide for any relief or penalty identified in this Section, separately or in combination, by entering an order directing the respondent to:

\* \* \*

(C) *** Hire, reinstate or upgrade the complainant with or without back pay or provide such fringe benefits as the complainant may have been denied." (Ill. Rev. Stat. 1987, ch. 68, par. 8—108(C).)

Damages awarded to a prevailing complainant under the Act must be affirmed on review absent an abuse of discretion. *Loyola University v. Human Rights Comm'n* (1986), 149 Ill. App. 3d 8, 500 N.E.2d 639.

▓▓ From the record before us, we cannot say that the Commission abused its discretion in awarding Savage lost benefits in addition to back pay. DOC offered no evidence, explanation or alternative calculations at the hearing below, concerning the benefits included in the annual salary or its policies pertaining to compensation for unused sick, personal, and vacation days. Consequently, the damage award will not be set aside. The purpose of a back pay award is to put the discriminatee in the position he or she would have been in respecting

salary, raises, sick leave, vacation pay, pension benefits, and other fringe benefits, but for the discriminatory act. Any ambiguities are to be resolved against the discriminating employer, since the employer's wrongful act gave rise to the uncertainty. *Clark v. Human Rights Comm'n* (1986), 141 Ill. App. 3d 178, 490 N.E.2d 29.

For all of the foregoing reasons, the order of the Human Rights Commission is affirmed. Savage's motion to strike, which was taken with the case, is denied.

Affirmed.

McCULLOUGH, P.J., and LUND, J., concur.