629 So.2d 761 (1993)
B.E.S.
v.
STATE.
CR-92-253.
Court of Criminal Appeals of Alabama.
July 9, 1993.
Rehearing Denied September 3, 1993.
Certiorari Denied December 3, 1993.
*762 Julius H. Hunter, Jr., Phenix City, for appellant.
James H. Evans, Atty. Gen., and Jack Willis, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 1921894.
BOWEN, Presiding Judge.
The appellant, B.E.S., was adjudicated delinquent based on a petition charging him with harassment. He was fined $50 and was placed on six month's unsupervised probation.
The State's evidence tended to show that on July 9, 1992, the complainant, Sheree Elder, and her husband, Robert, were in the process of moving out of "a double wide [mobile home]" that they "shar[ed]" with the appellant and his family. R. 5. Mrs. Elder testified that she was expecting a telephone call that day and that she had asked the appellant and his brother, D.S., to "let [her] know" when the call came in. R. 10. According to Mrs. Elder, the person she was expecting to call did call, but she was not notified of the call. Mrs. Elder related that when she asked B.E.S. and D.S. why she was not told about the telephone call,
"[w]ell they, I don't know what was really said about that, but anyway, it just went on and he told, [B.E.S.] told me to shut the F up and he also told me don't let the door hit me in the ass when I leave. He never did get in my face, he did not get close to me like he was going to hit me, all he did was say things to me, he didn't make any attempts to even get close to me."
R. 10.
Robert Elder testified that he was outside "loading the truck" when these words were spoken to his wife. R. 7. He testified that both brothers "would just like get in [his] face and try to intimidate [him]." R. 6. At one point, D.S. "balled his fist up" in Elder's face and "str[uck] his [own] hand." R. 8-9. However, Mr. Elder could not remember what, if anything, D.S. said at the time.
Mrs. Elder testified that after they had loaded their car and truck, they left to go to Mr. Elder's son's house. Mrs. Elder was driving the truck and Mr. Elder was following her in the car. Mr. Elder's two grandchildren were riding in the truck with Mrs. Elder. After stopping to inform their landlady that they were leaving, the Elders came back by the rental unit in order to leave the property. Mrs. Elder testified that a vehicle driven by B.E.S. and occupied by D.S. and *763 other people that she did not know began to follow her and her husband. This car "tailgat[ed]" first her husband, then her and nearly ran her off the road. R. 13. This vehicle also got in front of both her and her husband and D.S. shone a spotlight into their eyes.
The Elders' landlady, Tina Hurst, testified that when the Elders came by to tell her that they were leaving, Mrs. Elder "was almost in tears," and she "was very upset, she was crying, well practically, she was shaking." R. 18-19. She also stated that she had observed B.E.S., D.S., and some of their friends get into a vehicle and begin to follow the Elders. At this time, the people in the car "had a spotlight on." R. 20. Although she was not sure who was holding the spotlight, Mrs. Hurst testified that B.E.S. was driving the vehicle that "pulled out directly behind [the Elders]." R. 20.
The evidence adduced by the State might have supported a number of criminal charges, including reckless driving,[1] Ala.Code 1975, § 32-5A-190, reckless endangerment, § 13A-6-24, or menacing, § 13A-6-23. However, the petition charged the appellant only with verbal harassment, which is defined by § 13A-11-8(a)(1)(b) as follows: "A person commits the crime of harassment if, with intent to harass, annoy or alarm another person he ... [d]irects abusive or obscene language or makes an obscene gesture towards another person."[2]
Section 13A-11-8(a)(1)(b) clearly seeks to restrict speech, which, under the First Amendment, states have only limited authority to regulate. See Consolidated Edison Co. v. Public Service Comm'n, 447 U.S. 530, 540, 100 S.Ct. 2326, 2335, 65 L.Ed.2d 319 (1980) ("[w]here a government restricts the speech of a private person, the state action may be sustained only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest"). However, "[g]overnment regulation of speech has been allowed when the purpose of the statute was to proscribe `fighting words.'" J. Nowak & R. Rotunda, Constitutional Law § 16.37 (4th ed. 1991). As the United States Supreme Court stated in Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942):
"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or `fighting' words." (Footnote omitted.)
In order to bring § 13A-11-8(a)(1)(b) within the range of constitutionally permitted legislation, we have held that the words "abusive or obscene language," as used in this statute, are to be "`interpreted narrowly to apply only to "fighting words."'" Robinson v. State, 615 So.2d 112, 113 (Ala.Cr.App.1992) (applying Swann v. City of Huntsville, 455 So.2d 944, 950 (Ala.Cr.App.1984), and Mosley v. City of Auburn, 428 So.2d 165, 166 (Ala.Cr. App.1982), superseded on other grounds, Mason v. City of Vestavia Hills, 518 So.2d 221 (Ala.Cr.App.1987), wherein this Court had previously interpreted in the same manner the same words contained in § 13A-11-7(a)(3), the disorderly conduct statute). See also Shinault v. City of Huntsville, 579 So.2d 696, 699-700 (Ala.Cr.App.1991) (Bowen, J., concurring in result). Consequently, the dispositive issue in this case is obviously whether the words spoken by the appellant to Mrs. Elder constitute "fighting words." The appellant maintains that they do not.
*764 "Fighting words" are "personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." Cohen v. California, 403 U.S. 15, 20, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284 (1971). The utterance itself must "tend to incite an immediate breach of the peace." Chaplinsky v. New Hampshire, 315 U.S. at 572, 62 S.Ct. at 769. See also Lewis v. City of New Orleans, 415 U.S. 130, 132, 94 S.Ct. 970, 972, 39 L.Ed.2d 214 (1974). "It is not enough that [the words] merely arouse anger or resentment," Skelton v. City of Birmingham, 342 So.2d 933, 937 (Ala.Cr.App.), remanded on other grounds, 342 So.2d 937 (Ala.1976), or that the words are deemed "a socially unacceptable mode of communication," State v. Authelet, 120 R.I. 42, 385 A.2d 642, 649 (R.I.1978). It is clear that the words must "by their very utterance provoke a swift physical retaliation and incite an immediate breach of the peace." Skelton v. City of Birmingham, 342 So.2d at 936-37.
"[W]ords may or may not be `fighting words,' depending upon the circumstances of their utterance." Lewis v. New Orleans, 415 U.S. at 135, 94 S.Ct. at 973 (Powell, J., concurring). Accord In re Welfare of S.L.J., 263 N.W.2d 412, 419 (Minn.1978). Words must be evaluated in the era in which they are utteredwords that constitute fighting words change from generation to generation, or even more quickly. Compare Chaplinsky v. New Hampshire, 315 U.S. at 574, 62 S.Ct. at 770 (1942 holding that "the appellations `damned racketeer' and `damned Fascist'" were fighting words) with Robinson v. State, 588 N.E.2d 533, 536 (Ind.App.1992) (Shields, J., dissenting) (1992 dissent arguing that words "motherfuckers" and "fuckers," "in present common usage, [refer to] `a mean, despicable, or vicious person,' and `anything considered to be despicable, frustrating'" and no longer constitute fighting words). As Justice Powell has noted, "[l]anguage likely to offend the sensibility of some listeners is now fairly commonplace in many social gatherings as well as in public performances." Eaton v. City of Tulsa, 415 U.S. 697, 700, 94 S.Ct. 1228, 1231, 39 L.Ed.2d 693 (1974) (Powell, J., concurring).
We have held that two uses of the word "fuck" did not constitute fighting words when spoken to police officers. See Robinson v. State, 615 So.2d at 114 ("Fuck R. Lewis" not fighting words when spoken to police officer); L.M.A.W. v. State, 611 So.2d 497, 497-98 (Ala.Cr.App.1992) ("I don't need this fuckin' school anyway" not fighting words when spoken to police chief). In so holding, we have recognized that
"`[u]nfortunately, epithets ... directed at a police officer in the performance of his duties are not uncommon in today's law enforcement environment. The fact that an officer encounters such vulgarities with some frequency, and the fact that his training enables him to diffuse a potentially volatile situation without physical retaliation, however, means that words which might provoke a violent response from the average person do not, when addressed to a police officer, amount to "fighting words."'"
Robinson v. State, 615 So.2d at 114 (quoting Shinault v. City of Huntsville, 579 So.2d at 700 (Bowen, J., concurring). We note that other state courts also adhere to this position. See, e.g., Diehl v. State, 294 Md. 466, 451 A.2d 115, 122 (1982) (saying "fuck you" to police officer did not amount to fighting words), cert. denied, 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 363 (1983); In re Welfare of S.L.J., 263 N.W.2d at 419-20 (saying "fuck you pigs" to police officers did not amount to fighting words). But see, e.g., L.J.M. v. State, 541 So.2d 1321, 1322-23 (Fla.App.) (calling police officer "pussy-assed mother fucker" amounted to fighting words), review denied, 549 So.2d 1014 (Fla.1989); Robinson v. State, 588 N.E.2d 533, 535-36 (Ind.App. 1992) (screaming at police officer "to get the fuck away" and calling police officer "lying mother-fucker" amounted to fighting words).
The statements in the present case were not made to a police officer, but to a civilian. According to Mrs. Elder, the appellant "told [her] to shut the F[uck] up" and not to "let the door hit [her] in the ass when [she] left." R. 10. These statements, if not the entire confrontation with B.E.S. and his brother, obviously upset Mrs. Elder and quite probably aroused her anger or resentment. *765 However, the question is whether the words "provoke[d] a swift physical retaliation and incite[d] an immediate breach of the peace." Skelton v. City of Birmingham, 342 So.2d at 936-37. Clearly, the statements did not do so in this particular case.
Moreover, "`[t]he test is what men of common intelligence would understand would be words likely to cause an average addressee to fight.'" Chaplinsky v. New Hampshire, 315 U.S. at 573, 62 S.Ct. at 770. See also Cohen v. California, 403 U.S. at 20, 91 S.Ct. at 1785 (defining "fighting words" as "personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction") (emphasis added). Clearly, this test "is an objective one." State v. Authelet, 385 A.2d at 649.
"The paradigm case covered by Subsection (2)[3] is the intentional utterance of words so assaultive of personal dignity that they are likely to provoke physical retaliation against the speaker. It is the prospect of violence and disorder that the provision seeks to avoid and not merely unwelcome or unfriendly conversation.... The words so directed must be sufficiently offensive to raise a probability of physical retaliation by the addressee or someone acting in his interest. Whether such likelihood exists is determined objectively. The actor does not take the risk that the person to whom he speaks will show himself especially sensitive or hot-headed. He does not violate this section merely because another person is unable to control himself within the normal range of public interaction. Neither does he avoid penal sanctions simply because he chooses to taunt or challenge an especially controlled or timid individual. Liability is premised on the risk intentionally created by the actor rather than on the potentially idiosyncratic reactions of others. That the standard of `likely to provoke violent or disorderly response' is objective in character, however, does not mean that it is uniform in all situations. Often, this issue will turn on a matter of context."
A.L.I. Model Penal Code § 250.4 at 365-66 (1980) (footnote added).
In this case, the word "fuck" was not used as a derogatory personal comment, compare, e.g., L.J.M. v. State, 541 So.2d at 1322-23 (calling police officer "pussy-assed mother fucker"); Robinson v. State, 588 N.E.2d at 535-36 (calling police officer "lying mother-fucker"), but was used to add emphasis, much in the manner as "hell" or "damn" might be used. Without offering any approval of such use, we note that the word "fuck" is used habitually in this context by any number of people. See Diehl v. State, 451 A.2d at 122 (noting that, with regard to the word "fuck," "[o]ne man's vulgarity may well be another's vernacular"); cf. State v. Human Rights Comm'n, 178 Ill.App.3d 1033, 128 Ill.Dec. 141, 149, 534 N.E.2d 161, 169 (1989) (upholding magistrate's finding that use of "general sexual terms" such as "fuck" and "motherfucker" as expletives "did not amount to sexual conduct" in sexual harassment case). While both comments by the appellant indicate that his manners are execrable, we do not think either comment would cause the average person, in this day and time, to react violently.
Considering the circumstances under which these statements were made, including the fact that the statements were made during a private quarrel in the residence occupied by both the speaker and the addressee, we do not think the appellant's statements rise to the level of "fighting words." We recognize, however, that there are circumstances under which similar comments could be construed as fighting words. See State v. James M., 111 N.M. 473, 806 P.2d 1063, 1066 (App.1990) (juvenile defendant's speech amounted to fighting words where he and a civilian were arguing on a public sidewalk; defendant "was flailing his arms" and was repeatedly yelling at civilian, "[f]uck you" and "[f]uck you, you don't know who I am"; "[b]oth parties were upset"; and "four or five people had gathered to watch"), cert. denied, 111 N.M. 529, 807 P.2d 227 (1991). Those *766 circumstances simply do not exist in the present case.
Because the State has failed to prove an essential element of the charged offense, the appellant's adjudication of delinquency must be reversed and a verdict rendered in his favor. Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). See also L.M.A.W. v. State, 611 So.2d at 498.
REVERSED AND RENDERED.
PATTERSON, McMILLAN and MONTIEL, JJ., concur.
TAYLOR, J., concurs in result only, without opinion.
NOTES
[1] In fact, the record contains an "Alabama Uniform Incident/Offense Report" that lists both reckless driving and harassment for the "type [of] incident or offense." C.R. 4.
[2] The petition charged, in pertinent part, that "on or about 07/09/92 [B.E.S.] did, with intent to harass, annoy or alarm Sheree Elder, direct abusive or obscene language, or make an obscene gesture toward the said Sheree Elder in violation of § 13A-11-8(A)." C.R. 2

Although the petition charging D.S. is not contained in the record, it appears that he was also charged with verbal harassment. After the State had presented its witnesses, counsel for D.S. moved that the petition against D.S. be dismissed because "the State just has not sustained that petition." R. 30. The trial court dismissed the petition against D.S. without additional comment. R. 31.
[3] The Model Penal Code defines harassment to include "(2) insults, taunts or challenges [made to another with the purpose to harass and] in a manner likely to provoke violent or disorderly response." A.L.I. Model Penal Code § 250.4(2).